### EDISON LIGHT & POWER CO. v. PENNSYLVANIA PUBLIC UTILITY COMMISSION et al.

### No. 9893.

District Court, E. D. Pennsylvania.

Aug. 16, 1940.

Edward A. G. Porter, of Philadelphia, Pa., David I. McCahill, of Pittsburgh, Pa., and Vincent King Keesey, of York, Pa., for Edison.

Harry H. Frank, Frederic P. Glick, Samuel Graff Miller, and Harry M. Showalter, all of Harrisburg, Pa., for Pennsylvania Public Utility Commission.

Sylvan H. Hirsch, Morton P. Rome, and Sundheim, Folz & Hirsch, all of Philadelphia, Pa., for Utility Consumers League.

Martin B. Ebbert, of York, Pa., for City of York.

KIRKPATRICK, District Judge.

These petitions come at the end of protracted litigation which began with an investigation by the Public Utilities Commission (the Public Service Commission) of Pennsylvania to determine the reasonableness of rates for electric power charged by the Edison Light and Power Company of York, Pennsylvania, and finally reached the Supreme Court of the United States on injunction proceedings in the Federal Courts to restrain an order of the Commission reducing the rates. The petitions are presented by a small group of consumers, under the name of Utility Consumers League of York, Pennsylvania. They pray for orders respectively (1) directing the Power Company to pay overcharges accumulated during the pendency of the injunction proceedings, together with interest from the date of the order, and (2) allowing expenses and counsel fees and directing these items to be deducted from the accumulated overcharges due the general body of consumers of electric power and paid to the petitioners and their attorneys.

The first petition is not resisted either by the Power Company or by the Utility Commission, and the prayer will be granted without further discussion.

The second petition is contested by the Utility Commission and by the City of York, the largest individual consumer of power. Testimony was taken upon the petitions and answers, and the facts are found to be as follows:

Prior to April, 1935, the Power Company had been operating in the City of York. It was a wholly owned subsidiary of the York Railways Company, which operated a street railway in the same city. The Power Company had been making money and the Railway Company losing. On June 17, 1935, the Power Company filed application with the Pennsylvania Public Service Commission for permission to merge with the Railway Company. Mr. Willis E. Ramsey and several other citizens of York had, prior to that time, employed Herbert B. Cohen, Esq. (and later the other attorneys, Mr. Liverant, Mr. Anderson and Mr. Lawyer), to determine whether the facts would warrant opposing the application, and, after Mr. Cohen reported, they formed the group known as Utility Consumers League, who directed the attorneys to file a protest, which was done on July 9, 1935.

The terms upon which the attorneys accepted the employment were somewhat vague. It was distinctly understood that the small group which employed them was not to pay counsel fees. There was a general belief that the Power Company's rates were too high and could be brought down. Previous reductions had been ordered by the Commission, and rather complete data as to the rate base of the Power Company were on file with the Commission. Mr. Ramsey testified: "Well, there was nothing—we didn't make a distinction there, we just took it for granted, I presume, that it would—that if we succeeded in getting a rate reduction that there would be—then there would be counsel fees from the consuming public in general." Mr. Cohen said:

"I suggested at that time, in the discussion of fees, that I felt that during the course of the litigation events would so materialize that if we were successful in effectuating a material reduction in the rates of the Edison Light and Power Company that we would be able to receive our fees out of the general mass of consumers

for our efforts expended in that direction, so we were—

"Q. Well, did you have any specific agreement with the Utility Consumers League at that time, or at any subsequent time, for the fee to be paid by it or its members? A. There were no agreements with the Utility Consumers League, other than our compensation was to be contingent upon the successful outcome of the litigation."

At the time the attorneys were employed, the Consumers League had 25 or 30 members. Efforts were made to increase its membership, but not more than 60 members were ever obtained. The total number of consumers affected by the Power Company's rates was about 30,000.

The attorneys actively represented the Consumers League at the hearings upon the merger application. In the brief filed by them it was pointed out that the proposed merger would result in a new and expanded rate base, and that, as a result, it would become much more difficult to revise the Power Company's rate schedule, which, it was asserted, was already unreasonable and excessive, and should be revised by the Commission on its own motion.

The Commission, on January 27, 1936, handed down orders (1) denying the merger application and (2) instituting an investigation of its own motion into the reasonableness of the Power Company's rates.

The Commission's rate investigation lasted until July 13, 1936, on which date it issued a temporary order directing the filing of new rate schedules effecting a reduction to consumers of approximately $435,000 annually. In this proceeding, apparently upon the request of a member of the Commission, the Consumers League did not intervene. Mr. Cohen was, however, present on more than half of the twelve days of hearings, he had numerous conferences with members of the Commission, and at one stage undertook, at the Commission's request, to negotiate with the Power Company for a voluntary reduction —an effort which resulted in an offer on the part of the Power Company of a $250,000 reduction, which was turned down by the Commission.

The Commission's order (revised, but not as to amount, on July 27, 1937) was immediately attacked by the Power Company before a three-judge Statutory Court for the Middle District of Pennsylvania, principally upon the ground that the Pennsylvania Public Utility Law, 66 P.S.Pa. § 1101 et seq., under which it had been entered, was unconstitutional. The Consumers League, through their attorneys, intervened in these proceedings. The Court had suspended the operation of the new rate schedule by a temporary injunction, and, after final hearing, issued a permanent injunction on October 15, 1937. Edison Light & Power Co. v. Driscoll, D.C., 21 F.Supp. 1.

One of the three judges held the Act unconstitutional; the other two held it constitutional, but held the order as issued defective and invalid. Neither side appealed from the Court's decree, but on November 30, 1937, the Commission issued a new order revised to comply with the Court's objections as to form, but establishing the same reduction.

Before December 17, 1937, the effective date of the new order, it was also attacked by the Power Company, before a new Statutory Court, this time for the Eastern District of Pennsylvania. The operation of the new schedule was temporarily restrained on the Power Company's giving bond in the amount of $240,000, and on October 10, 1938, the Court granted a permanent injunction on the ground that the Act was unconstitutional. Edison Light & Power Co. v. Driscoll, D.C., 25 F.Supp. 192. The Consumers' League had intervened, and a joint appeal was taken by the Commission and the League to the Supreme Court of the United States. 307 U.S. 104, 59 S.Ct. 715, 83 L.Ed. 1134.

The appeal resulted, on April 17, 1939, in the reversal of the decree and the vacation of the injunction, and on May 1, 1939, in obedience to an order of the Commission, the Power Company filed its schedule effecting a rate reduction of $435,000 annually. On November 13, 1939, the Commission filed an interim order directing the Power Company to refund overcharges from December 17, 1937, to May 1, 1939, on or before March 1, 1940.

These petitions followed. They were filed before this Court by virtue of the mandate of the Supreme Court of the United States, which directed that "further proceedings be had in such cause, in conformity with the opinion and decree of this Court as according to right and justice, and the laws of the United States, order to be had * * *."

The attorneys, representing the Consumers League, had appeared and had taken

an active part at all stages in both injunction proceedings. The Commission was represented by its own counsel before the two Statutory Courts, and before the Supreme Court by the Attorney General of Pennsylvania, now Judge Bard. Mr. Cohen was present at the argument before the Supreme Court and had been in frequent conference with Judge Bard in preparation for it. Throughout the proceedings the Commission was regarded as the principal litigant and assumed the major role.

It appears that, immediately after the first injunction issued, the Commission desired to employ Mr. Cohen as special counsel to represent it in subsequent proceedings. However, the Governor vetoed the proposal, saying that "he was afraid he would have every lawyer in the Legislature coming and wanting a position if we would elect him." Mr. Cohen, it may be stated, was a member of the State Legislature and Chairman of the Appropriations Committee of the House.

During all the proceedings so far referred to, no consumer other than the League intervened or appeared or employed either these attorneys or any other counsel to represent them at any time.

To sum up, the proceedings detailed above fall into three main stages: First, the application for merger; second, the rate investigation proceedings; and third, the injunction suits in the Federal Courts. The services rendered by the attorneys for which compensation is claimed from the consumers in general are as follows: In the merger proceeding, they appeared representing a small group of protestants and presented argument in part directing the attention of the Commission to the unreasonableness of the Power Company's rates. In this connection, however, it must be noted that the Power Company never denied that its rates were producing more than 7½% upon a fair rate base for its own property, but took the position that it was entitled to that figure by reason of its affiliation with the Railway Company and certain obligations in respect of the latter's bonded indebtedness. In the rate investigation, the work of the attorneys was limited to the presence of Mr. Cohen at a number of hearings in the capacity of an observer and a number of conferences with the Commission, which were welcomed by the Commission and were undoubtedly of assistance. In the injunction proceedings, the attorneys appeared representing the Consumers League as intervenor and took an active, though subordinate, part throughout.

For these services the petitioners ask an allowance of a counsel fee for their attorneys. No specific amount is requested, but the figure suggested is $100,000. If these attorneys were representing the whole body of consumers and had entered the case for them upon a contingent basis, the amount would not be unreasonable, in view of the large reduction in rates affected, and the amount of overcharges now due to be repaid.

The theory of the petition is, of course, that the attorneys have created or protected a common fund for the benefit of all the consumers and that, under the rule of Trustees of Internal Improvement Fund v. Greenough, 105 U.S. 527, 26 L.Ed. 1157; Hempstead v. Meadville Theological School, 286 Pa. 493, 134 A. 103, 49 A.L.R. 1145, they are entitled to charge counsel fees against the fund.

The prayer of the petition must be denied. No statement of the rule on which the petitioners rely has ever extended it to a case in which all the other beneficiaries of the fund have been at every stage of the proceeding which resulted in the creation of the fund actively and adequately represented, and the equitable considerations upon which the rule is based forbid its application in such cases.

Beginning with the Commission's rate investigation and throughout its fight to protect its order in the Federal Courts, the entire body of consumers was represented by the Public Utility Commission, its legal staff, and the Attorney General of Pennsylvania. Or, if a technical representation—the relation of attorney and client—did not exist, at least these officers assumed, in accordance with the law and the policy of the state, the duty of protecting the consuming public's interests; and there is no suggestion that there was any negligence, inefficiency, or want of fidelity on their part which required their efforts to be supplemented by the attorneys representing the petitioners. I cannot state this reason for denying the petition more succinctly than it has been stated in the brief for the Commission: "The Pennsylvania Public Utility Commission as an agent of the Pennsylvania legislature is charged with the duty of seeing that the public is furnished adequate service at reasonable rates. The Commission, by its

counsel, took such steps as were necessary to determine the reasonableness of the rates of the Edison Company and issued an order at C. 11108 ordering a temporary reduction. The Commission, by its counsel, took such legal action as was necessary to defend the order of the Commission when that order was attacked in the District Courts of the United States and on appeal to the United States Supreme Court."

It is hardly necessary to cite authorities to sustain the proposition that, where all the beneficiaries are represented, attorneys representing certain individuals among them may not be granted allowances out of the fund. However, Peoples-Pittsburgh Trust Co. v. Pittsburgh United Corporation, 334 Pa. 107, 5 A.2d 890; Penington v. Commonwealth Hotel Construction Corp., 18 Del.Ch. 238, 158 A. 140; General Finance Corp. v. New York State Rys., D.C., 3 F. Supp. 975; In re United Cigar Stores Co. of America, D.C., 21 F.Supp. 869, 875, may be referred to.

As to the merger proceeding, I am unable to see any possible theory upon which the attorneys could be allowed fees for services in it. The protest was not primarily directed toward the reduction of rates or the creation of a fund thereby, and the disapproval of the merger had no such effect. It cannot be seriously argued that, because an attorney in one proceeding presses a suggestion which brings on an entirely different proceeding for the recovery or protection of a fund, he is on that ground alone entitled to charge counsel fees against the fund, if not otherwise entitled to do so.

There is no suggestion that these attorneys ever had any contractual or professional relations with any consumer other than the members of the Consumers League, and, as to that group, the understanding was that it was not to bear more than a proportionate share (if that much) of the costs of legal services. Thus it will be seen that this petition is not presented in order to distribute a burden incurred by the petitioners, among the beneficiaries of their action, but, in substance, is an attempt by the attorneys to compel payment of their fees by some 30,000 persons and corporations none of whom ever made any agreement to pay them anything, and only 50 or 60 of whom ever authorized them to act at all in the matter.

In the recent case of Sprague v. Ticonic Nat. Bank, 307 U.S. 161, 59 S.Ct. 777, 779, 83 L.Ed. 1184, discussion was confined to what were known as costs "between solicitor and client," as distinguished from costs as "between party and party." The Court was dealing with the power of the chancellor to allow such costs on the principle of a benefit, by virtue of the rule, stare decisis, to other similarly situated parties. The Court did not suggest what fees were allowable, and it is more than doubtful whether it intended to sustain the power in respect of anything but fees for legal services incurred by the petitioner in that case. As has been pointed out, these petitioners themselves are under no liability to the attorneys in respect of legal services, and, consequently, there are no costs as between solicitor and client. Even if the general consumers had not been adequately represented as to this particular matter, I do not think that the rules laid down in Sprague v. Ticonic Nat. Bank, supra, are broad enough to allow the fee to be charged to the fund.

The Commission also urges as a reason for denying the prayer of the petition that the efforts of these attorneys were not in fact directed toward the creation of any fund, and cites Eckford v. Borough of Atlanta, 173 Ga. 650, 160 S.E. 773, a case almost exactly in point. The fund (if there really be any fund at all in the proper sense) came into existence by the fortuitous circumstance that the reductions ordered were not allowed to go into effect for a year and a half, because of the interposition of injunctions. Whether the decision in Sprague v. Ticonic Nat. Bank, supra, overcomes this particular objection need not be decided, because I think the decision is already on a sound basis.

▄▄ I cannot see that the inclusion of interest in the order of this Court distinguishes the services in respect of it sufficiently to permit me to allow compensation. The order of the Commission of November 13, directed the Power Company to "make complete refunds," and included a clause that it was without prejudice to the award of further refunds. Whether or not that is an express order to pay interest on the overcharges, the Power Company does not, and, so far as I know, has not at any time since the order, denied its liability for interest. I do not question counsel's statement that the question is expressly raised for the first time in the first of the two petitions now before the Court, but it does not appear that the interests of the general consumers have not been already fully protected by an order requiring com-

plete refunds, inasmuch as the law is well established that it is within the power of the Court (if not the Commission as well) to award interest on retained overcharges.

The petition for allowances is dismissed.