Oliver R. GRACE et al., Plaintiffs-
Appellants,

v.

Daniel K. LUDWIG et al.,
Defendants-Appellees.

No. 859, Docket 73-1212.

United States Court of Appeals,
Second Circuit.

Argued June 5, 1973.

Decided Sept. 12, 1973.

Sidney Bender, New York City (Leventritt, Lewittes & Bender, New York City, of counsel), pro se and for all other plaintiffs-appellants.

William E. Haudek, New York City (Pomerantz, Levy, Haudek & Block, New York City, Abraham L. Pomerantz and Julius Levy, New York City, of counsel), for defendants-appellees Daniel K. Ludwig, Berkshire Industries, Inc., and American Hawaiian Steamship Co.

Charles A. Stillman, New York City (Morrison, Paul, Stillman & Beiley, New York City, and Peter H. Morrison, Benjamin Zelermyer and Julian W. Friedman, New York City, of counsel), for defendant-appellee Robert Korsen.

Gary J. Greenberg, New York City (Stroock & Stroock & Lavan, New York City, of counsel), for defendants-appellees Trude Weininger and Premier Investing Corp.

Before HAYS, MANSFIELD and MULLIGAN, Circuit Judges.

MULLIGAN, Circuit Judge:

The controversy before us on appeal originated when the defendant Berkshire Industries, Inc. ("Berkshire") applied to the SEC for an exemption under Section 17 of the Investment Company Act of 1940 (the "Act"), 15 U.S.C. § 80a–17,[1] which would permit it to absorb its 91% owned subsidiary the defendant American-Hawaiian Steamship Company ("American") by a short form merger. American is a registered closed-end investment company and the Act prohibits such merger unless the SEC finds that the transaction is reasonable, fair, free of overreaching and consistent with the general purposes of the Act. Under the terms of the proposed merger, American's minority stockholders were to be paid cash for their stock and Berkshire's stock in American was to be cancelled. The plaintiffs Grace, et al. were minority stockholders of American. Plaintiffs Leventritt Lewittes & Bender ("LLB") were their counsel. In addition to Berkshire and American the other defendants in this action are Daniel K. Ludwig

---

1. Section 17 of the Investment Company Act of 1940, 15 U.S.C. § 80a–17, provides in pertinent part:

(a) It shall be unlawful for any affiliated person or promoter of or principal underwriter for a registered investment company (other than a company of the character described in Section 80a–12(d)(3)(A) and (B) of this title), or any affiliated person of such a person, promoter, or principal underwriter, acting as principal—

(1) knowingly to sell any security or other property to such registered company or to any company controlled by such registered company, unless such sale involves solely (A) securities of which the buyer is the issuer, (B) securities of which the seller is the issuer and which are part of a general offering to the holders of a class of its securities, or (C) securities deposited with the trustee of a unit investment trust or periodic payment plan by the depositor thereof;

(2) knowingly to purchase from such registered company, or from any company controlled by such registered company, any security or other property (except securities of which the seller is the issuer) or

(3) to borrow money or other property from such registered company or from any company controlled by such registered company (unless the borrower is controlled by the lender) except as permitted in section 80a–21(b) of this title.

(b) Notwithstanding subsection (a) of this section, any person may file with the Commission an application for an order exempting a proposed transaction of the applicant from one or more provisions of said subsection. The Commission shall grant such application and issue such order of exemption if evidence establishes that—

(1) the terms of the proposed transaction, including the consideration to be paid or received, are reasonable and fair and do not involve overreaching on the part of any person concerned;

(2) the proposed transaction is consistent with the policy of each registered investment company concerned, as recited in its registration statement and reports filed under this subchapter; and

(3) the proposed transaction is consistent with the general purposes of this subchapter.

(Ludwig) the sole stockholder of Berkshire and Trude Weininger, Premier Investing Corporation and Robert Korsen who were or are, other minority stockholders of American.[2]

### The SEC Proceeding

Berkshire filed its 17(b) application on July 31, 1967, proposing a short form merger of American into Berkshire pursuant to the then § 14:12–10 of the New Jersey General Corporation Law which was concededly applicable and permitted a New Jersey corporation owning 90% or more of a New Jersey subsidiary to merge the subsidiary into the parent by resolution of the parent's board of directors setting forth the terms of the merger. Minority stockholders could accept the price fixed in the resolution or demand an appraisal of their stock. Berkshire estimated the net value of American at about $53 million and proposed to offer $275 per share to American minority stockholders.

The parties to the SEC proceeding were Berkshire and the SEC's Division of Corporate Regulation (Rule 9(a), SEC Rules of Practice, 17 C.F.R. § 201.9(a)). The SEC on October 25, 1967 directed a hearing on notice to all interested parties. Grace and the other plaintiffs thereupon retained LLB who appeared for them after leave to participate had been granted pursuant to Rule 9(c), 17 C.F.R. § 201.9(c). Evidentiary hearings on Berkshire's application were conducted before a hearing examiner of the SEC from January 4th to June 7th, 1968, totalling about 50 hearing days. Counsel for the SEC's Division of Corporate Regulation also appeared. Seventeen witnesses testified, 550 exhibits were introduced and a 7500 page transcript of the hearing was compiled. At the end of the hearings the parties agreed pursuant to Rules 8(b) and (c), 17 C.F.R. § 201.8(b) and (c), to waive an initial decision by the hearing examiner and to permit the SEC staff to assist the Commission in the preparation of its decision. A hearing before the full Commission was held on November 12, 1968. Prior to any decision by the Commission, Berkshire advised the SEC that a sale of certain property owned by American might have an impact on the valuation of the American stock. Berkshire thereafter applied for and was granted on June 12, 1969 a re-opening of the proceedings to adduce additional evidence. After two days of hearings (August 4 and 11, 1969) a settlement proposal of Berkshire was rejected by LLB and Berkshire sought leave to withdraw its 17(b) application. The SEC on November 28th, 1969 allowed the withdrawal and denied LLB's claim for a fee to be paid by American or Berkshire, without prejudice to any other legal remedy which the plaintiffs might pursue, since the agency lacked jurisdiction to award counsel fees. This action set the stage for the proceeding below.

### The Court Proceedings

On March 20, 1970 plaintiffs commenced an action in the United States District Court, Southern District of New York, seeking attorney's fees and expenses against the defendants arising out of the SEC proceeding. In essence, LLB claims that although Berkshire initially offered only $275 per share as the fair and reasonable value of American shares, primarily due to the services of LLB Berkshire successively raised its offer to $375 per share, $575 per share and eventually $650 per share or more than double the initial offer. American's net value was thus considered to be $126 million instead of the $53 million initially estimated by Berkshire.

Plaintiffs allege that Ludwig and Berkshire, as controlling shareholders, owed a fiduciary obligation to American and its minority shareholders to propose

---

**2.** American had 194,177 shares outstanding. Berkshire owned 91% or 176,719 shares. Of the remaining 9% or 17,558 shares, the plaintiff shareholders owned 4,830; defendant Korsen owned 825 and defendants Weininger and Premier Investing Corporation had owned 6,150. The balance, 5,653 shares, were widely held.

the merger on fair and reasonable terms. They claim that these defendants breached that obligation, committed an oppressive fraud against American and its minority shareholders and violated sections 17(a), (b) and 34(b) of the Investment Company Act (15 U.S.C. §§ 80a–17(a), (b) and 80a–33(b)) and sections 10, 14(e) and 27 of the Securities Exchange Act of 1934 (15 U.S.C. §§ 78j, 78n(e) and 78aa) as well as Rule 10b–5 (17 C.F.R. § 240.10b–5) by submitting the merger plan and application, supported by fraudulent misrepresentations, to the SEC.

LLB further claims that through its efforts the plan of Ludwig, Berkshire and American to defraud the American minority stockholder plaintiffs was thwarted and the added value of the American shares has been preserved to American and its stockholders. LLB seeks judgment against Ludwig or alternatively Berkshire or alternatively American for a fair and reasonable attorney's fee of ten million dollars (LLB would reimburse plaintiff stockholders' legal fees of $154,314 already paid to LLB). In the alternative, on the assumption that there was no corporate benefit to American, then Ludwig, Berkshire or American should pay LLB attorney's fees in the sum of $2,418,262 which is alleged to represent the benefit conferred upon the minority shareholders (excluding plaintiff shareholders) plus attorney's fees paid by plaintiffs to LLB. In the alternative, these amounts would be paid proportionately by the defendant shareholders of American. As a last alternative plaintiffs demanded "[t]hat the appropriate combination of defendants be adjudged liable to make appropriate payments quantum meruit to LLB and the appropriate combination of the above, excluding the [defendant shareholders of American], make appropriate reimbursement to plaintiff stockholders of fees paid or payable to LLB." Finally, Grace seeks reimbursement of expenses in the sum of $54,911.92 from Ludwig or in the alternative Berkshire.

Discovery proceedings were conducted, seven witnesses were deposed and scores of exhibits were introduced. Defendants American, Berkshire and Ludwig moved for judgment on the pleadings because of the legal insufficiency of the complaint; the remaining defendants moved for dismissal or summary judgment. The plaintiffs moved for summary judgment with supporting papers including a 40 page affidavit of LLB which incorporated the 7500 page SEC hearing transcript, as well as the exhibits and briefs before the SEC, plus the depositions and exhibits in the case below. The motions were argued on January 10, 1973 before the Hon. Whitman Knapp, District Judge. Judge Knapp announced that the only issue he would decide was whether the complaint stated a cause of action. He assumed the truth of the facts alleged in the complaint and the supporting papers and then dismissed the complaint without any formal opinion.[3]

## Jurisdiction

An initial and vexing question here is finding a basis for the jurisdiction of the federal court. The defendant minority stockholders urge that since the SEC denied LLB's application for a fee, the exclusive remedy was an appeal to this court which would preclude a collateral proceeding in the district court challenging the agency's ruling. (Securities Exchange Act, § 25(a), 15 U.S.C. § 78y(a); Investment Company Act, §

---

3. Judge Knapp stated below "no one is interested in my views on this subject but is interested in getting to the Court of Appeals. . . . I don't see anything further to be gained by discussion here or by my writing an opinion. The less I say the quicker you can get before the Court of Appeals." A similar reticence was expressed by the SEC on July 26, 1973 which declined to file an *amicus* brief expressing its opinion as to the propriety of a District Court award of a fee in the circumstances of this case. Counsel for all parties have however been generous in supplying this court with extensive briefs on appeal.

43(a), 15 U.S.C. § 80a–42(a)). The difficulty with this position is that the SEC simply held that it had no statutory authority to grant a fee and further held that its denial on jurisdictional grounds was without prejudice to LLB's "taking legal action to pursue any remedy they may have in this respect." The present action does not attack the determination that the SEC has no jurisdiction to award a fee but rather seeks a fee to be awarded by the court. There is therefore no res judicata problem here and no collateral attack. The question is whether the district court as a court of equity should award a fee to prevent an unjust enrichment. That question in our view is here litigable.

■ In essence, the complaint here charges that Berkshire and Ludwig, in proposing the "fair and reasonable" price of $275 per share for American stock in the application to the SEC for a 17(b) exemption, were engaged in a fraudulent scheme to freeze out the public stockholders and to eliminate American as an independent entity. Since we must accept the allegations of the complaint as true on this appeal (Gardner v. Toilet Goods Ass'n, 387 U.S. 167, 172, 87 S.Ct. 1526, 18 L.Ed.2d 704 (1967)), it would appear that the illicit behavior charged is encompassed within the substantive sections of the Investment Company Act, and of the Securities Exchange Act relied upon in the complaint. See Saylor v. Lindsley, 456 F.2d 896, 903–904 (2d Cir. 1972); cf. Entel v. Allen, 270 F.Supp. 60 (S.D.N.Y.1967). However, the jurisdictional sections (section 44 of the Investment Company Act, 15 U.S.C. § 80a–43, and section 27 of the Securities Exchange Act, 15 U.S. C. § 78aa) specify that federal courts shall have jurisdiction only of "violations" of these statutes and actions in equity and at law brought to enforce any "liability or duty" created by the statute or the rules promulgated thereunder. The minority stockholder defendants urge that they have committed no violations of the statutes involved and have no liabilities or duties under such statutes and therefore there is no jurisdiction here as to them. Indeed the complaint urges not that they have made any deceptive statements or participated in any fraudulent schemes but were rather the intended victims. This argument would be persuasive except that the plaintiffs also urge that the federal court has jurisdiction under 28 U.S.C. § 1331 which grants jurisdiction where the amount in controversy exceeds $10,000 and "arises under the Constitution, laws or treaties of the United States." We think that this action for fees and expenses does arise under the stated substantive sections of the Investment Company Act and Securities Exchange Act. Even though the minority stockholder defendants did not violate the sections, it is alleged that they benefitted from the LLB representation. We rely on Judge Friendly's *en banc* opinion in Gilson v. Chock Full O'Nuts Corp., 331 F.2d 107 (2d Cir. 1964) where an attorney had found a claim for recovery of "short swing" profits under § 16(b) of the 1934 Act, 15 U.S.C. § 78p(b), which the corporation at his urging then successfully pursued. We found that an action to recover an attorney's fee for this service to the corporation was a remedial incident to the § 16(b) action and was properly brought in the federal court. The corporation there was not in violation of the Securities laws any more than the minority stockholders here.[4] What we have held with respect to the section 1331 jurisdiction is of course equally applicable to American and *a fortiori* to Ludwig and Berkshire who are accused of substantive violations of the Acts in question in the complaint.

4. It is noteworthy that the *Gilson* litigation was originally commenced in the state courts, but was removed to the federal district court on the express ground that the claim for attorney's fees was one arising under the laws of the United States, specifically section 16(b) of the Securities Exchange Act, 15 U.S.C. § 78p(b). Gilson v. Chock Full O'Nuts Corp., 326 F.2d 246, 247 (2d Cir. 1964).

### The Merits

In American jurisprudence the general rule is that a successful litigant is not permitted to recover his attorney's fees as damages or as reimbursable costs. Fleischmann Distilling Corp. v. Maier Brewing Co., 386 U.S. 714, 717–720, 87 S.Ct. 1404, 18 L.Ed.2d 475 (1967); Day v. Woodworth, 54 U.S. (13 How.) 362, 371–375, 14 L.Ed. 181 (1852); Arcambel v. Wiseman, 3 U.S. (3 Dall.) 306, 1 L.Ed. 613 (1796).[5] However, it is also established that in special circumstances a court of equity does have the inherent power to reimburse a successful suitor for the costs of litigation, including his attorney's fees. Sprague v. Ticonic National Bank, 307 U.S. 161, 166, 59 S.Ct. 777, 83 L.Ed. 1184 (1939). In J. I. Case Co. v. Borak, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964), the Supreme Court emphasized that the private enforcement of the Securities laws as a supplement to SEC action, was highly desirable. It was not surprising therefore that in Mills v. Electric Auto-Lite Co., 396 U.S. 375, 391, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970) the Court gave its approbation to an award of attorney's fees to successful champions who in private litigation had vindicated the policy of the Securities laws. However, the Court found that there were "special circumstances" present which justified the award. We find no such circumstances here; we find no precedent for such an award here and indeed find considerations which would strongly militate against exercising our discretion in favor of the plaintiffs here.

At the heart of the doctrine favoring the award of counsel fees in securities cases is the need to encourage the vigilance of private attorneys general to provide corporate therapy protecting the public investor who might otherwise be victimized. See Rosenblatt v. Northwest Airlines, Inc., 435 F.2d 1121, 1124 (2d Cir. 1970). Thus in Borak the Court commented upon the practical inability of the SEC to thoroughly and independently examine the veracity of facts set out in proxy materials which, except for private litigant scrutiny, would be undetected until after a merger had been accomplished. J. I. Case Co. v. Borak, supra, 377 U.S. at 432–433, 84 S.Ct. 1555. Professor Cary has noted in reference to proxy statements and written proxy soliciting material: "The SEC does not purport to pass upon the merits or underwrite the accuracy or adequacy of the statements made." W. Cary, Corporations 306 (4th ed. 1969). The need for private enforcement continues and is accented as the filings burgeon.[6]

The same policy underlies the holdings of this court in leading cases such as Smolowe v. Delendo Corp., 136 F.2d 231 (2d Cir.), cert. denied, 320 U.S. 751, 64 S.Ct. 56, 88 L.Ed. 446 (1943), Gilson v. Chock Full O'Nuts Corp., 331 F.2d 107 (2d Cir. 1964) (en banc), and Blau v. Rayette-Faberge, Inc., 389 F.2d 469 (2d Cir. 1968), which permitted the recovery of attorney's fees where a derivative action had been brought to recover or to

---

5. In colonial America, most courts adopted the English practice of awarding attorney's fees to the successful party in actions at law. (C. McCormick, Damages 235 (1935)). Explanations as to why this practice was soon abandoned include statutory provisions granting attorneys fixed amounts which eventually lost all relation to actual costs (Ehrenzweig, Reimbursement of Counsel Fees and the Great Society, 54 Cal.L.Rev. 792, 798–99 (1966)), the distrust the colonists felt toward the legal profession (Goodhart, Costs, 38 Yale L.J. 849, 873 (1929)), and the individualistic spirit of the frontier society which viewed lawyers as an unnecessary luxury. (Note, Attorney's Fees: Where Shall the Ultimate Burden Lie?, 20 Vand.L.Rev. 1216, 1220 (1967)).

6. In Borak the Court pointed to the large number of proxy statements annually filed with the SEC (then over 2000) and the pressures of time under which the agency works in reviewing proxy materials. For fiscal year 1969 (the year in question here), the Commission reported that some 5,316 proxy statements in final form were filed, vis-a-vis some 249 applications for orders under the Investment Company Act submitted in that year. SEC, 35th Annual Report: 1969, at 46, 133.

instigate the recovery of insider short swing profits under section 16(b) which the corporation had failed or refused to bring on its own behalf. As we pointed out in *Smolowe*, "the possibility of recovering attorney's fees will provide the sole stimulus for the enforcement of § 16(b) . . ." 136 F.2d at 241.

We find no such "special circumstances" here. The role of the SEC in the case at hand was markedly distinguishable. The statute here did not envisage a simple reporting procedure or the mere submission of written materials for pro forma or perfunctory review. Under 17(a) of the Investment Company Act, the merger of American and Berkshire was prohibited unless application was made under 17(b) for an order of exemption. The Commission could only issue such an order if *evidence* established that the consideration to be paid was reasonable and fair and did not involve overreaching, and was consistent with the policy of the investment company and the Act. The SEC called for a hearing before a hearing examiner; extensive hearings were held with the SEC's Division of Corporate Regulation represented by counsel throughout.[7] Eventually, the 17(b) application was withdrawn by Berkshire. In this proceeding LLB entered its appearance on behalf of the Grace stockholders who had over a $3,800,000 interest and who had paid LLB some $154,314 in fees and expenses. In view of the direct and substantial interest of the Grace stockholders, LLB's representation was not stimulated solely by the expectation of fees from those who had not retained them.

(See *Smolowe, supra*). Inasmuch as Berkshire submitted the application for exemption to the Agency charged with protection of the public investors and extensive proceedings were held, there is no parallel here to cases where SEC scrutiny either has been avoided or in the nature of things its function is ministerial or casual.

LLB takes the position however that it pulled the "laboring oar" in the SEC proceedings and that primarily through its efforts Berkshire continuously increased its offer to the public shareholders. In the posture this case reaches us, these allegations must be accepted as true. We cannot accept, however. the premise that *but for* LLB's intervention the SEC would have approved as "fair and reasonable" the initial offer of Berkshire. If LLB had never appeared how can we properly assume that the SEC would have been so totally supine or so derelict as to give its approval to a price which plaintiffs urge was not merely unconscionably low but was in fact the product of a deception and fraud practiced by Berkshire and Ludwig? The record before us does not permit this inference, and in his letter announcing the Commission's refusal to submit an *amicus* brief, the SEC's General Counsel states: "It is by no means clear to the Commission that but for plaintiffs' intervention in the administrative proceeding the Commission and its then-Division of Corporate Regulation would have sanctioned a violation of the Investment Company Act, and since the application was withdrawn no finding concerning the proposed transaction was made."

**7.** This distinguishes Honda v. Mitchell, 136 U.S.App.D.C. 22, 419 F.2d 324 (D.C.Cir. 1969), relied upon by plaintiffs. The Attorney General, as successor to the Alien Property Custodian, sponsored hearings to determine the value of yen certificates held by American depositors of a Japanese bank whose assets had been seized during the war. While it is unquestioned that the Attorney General was required to deal "equitably" with the depositors' claims, his position was adverse to the claimants' who demanded that the certifi- cates be redeemed at the pre-war conversion rate, rather than the lower post-war rate he proposed. Clearly the award of counsel fees in that situation is no precedent for plaintiffs' instant claim, for the depositors' interests were not impartially represented by any Government agency. Furthermore, the claimants in *Honda*, unlike the defendants here, actually retained the legal counsel whose prosecution of their claims led in substantial part to the recovery out of which his fee was paid.

The complaint here does not allege that "but for" the LLB intervention the SEC would have granted the application for an exemption based on the initial offer by Berkshire. Appellant relies on the colloquy between Judge Knapp and counsel below in which he stated that he assumed that the SEC had done nothing and in fact had acted "horrendously" (even LLB recoiled from this characterization of the SEC performance). We cannot consider this comment as a finding of fact but only as an assumption not supported by any reference to the record. In re Rosen, 66 F.Supp. 174, 179 (D.N.J.), aff'd, 157 F.2d 997 (3rd Cir. 1946), cert. denied, 330 U.S. 835, 67 S.Ct. 972, 91 L.Ed. 1282 (1947). The motion here was for judgment on the pleadings and even as expanded by the affidavit we do not find warrant for the assumption.

Had the SEC granted the exemption and the initial $275 offer been approved and had LLB then successfully appeared in a derivative action on behalf of the public stockholders, we would have a decidedly different situation. The failure of the SEC to act properly would have been established. Saylor v. Lindsley, supra, 456 F.2d at 902–903; Entel v. Allen, supra; cf. Thomas v. Honeybrook Mines, Inc., 428 F.2d 981 (3d Cir. 1970), cert. denied, 401 U.S. 911, 91 S.Ct. 874, 27 L.Ed.2d 809 (1971); Powell v. Pennsylvania R.R., 166 F.Supp. 448 (E.D.Pa. 1958), reversed on other grounds, 267 F.2d 241 (3d Cir. 1959).

Assuming that LLB did pull the "laboring oar" in the proceeding before the SEC, it was in the interest of a substantial minority stockholder and it was the basis for a not insignificant fee. The fact that the SEC permitted admittedly able and persistent counsel to man the oars does not at all establish that the vessel would have otherwise foundered. LLB must then be characterized as a mere volunteer who aids a public body or trust in the performance of their official duties on behalf of a certain class, but who is not entitled to compensation. Edison Light & Power Co. v. Pennsyl-vania Pub. Util. Comm'n, 34 F.Supp. 939 (E.D.Pa.1940), aff'd on the opinion below, 119 F.2d 779 (3d Cir. 1941); King v. City of Covington, 289 Ky. 695, 160 S.W.2d 13 (1942); City of Englewood v. Allison Land Co., 45 N.J.Super. 538, 133 A.2d 680 (App.Div.1957); In re Katz' Estate, 40 N.J.Super. 103, 122 A.2d 185 (Super.Ct.1956); Peoples-Pittsburgh Trust Co. v. Pittsburgh United Corp., 334 Pa. 107, 5 A.2d 890 (1939). See Restatement of Restitution § 115, comment a, at 482 (1937).

Although we find no "special circumstances" here which would justify an award of counsel fees we should further state that the equitable basis in any event for such an award is the prevention of unjust enrichment. Mills v. Electric Auto-Lite Co., supra, 396 U.S. at 392, 90 S.Ct. 616; Fleischmann Distilling Corp. v. Maier Brewing Co., supra, 386 U.S. at 719, 87 S.Ct. 1404. The plaintiff at his own expense has conferred a benefit upon the defendant which justice demands he recompense. Restatement of Restitution § 1 (1937). We cannot agree that American or its principal shareholder, Berkshire (controlled by Ludwig), has been enriched by Grace or LLB. In sum, the complaint urges that Ludwig who controlled Berkshire and in turn American, knew full well the value of the American shares but was bent upon fleecing the public minority shareholders. No matter what transpired before the SEC the intrinsic value of American would be the same in so far as Berkshire and Ludwig were concerned. The merger was aborted and the theory of the complaint is that they have not been enriched but rather deprived by the intervention of plaintiffs. The only possible benefit could be to the minority stockholders who would have received less than half the true value of their holdings. The only other benefit alleged is that American's corporate identity was preserved. Realistically, however, since the merger was never effectuated American still remains with 91% of its shares in the hands of Berkshire with Ludwig still at

the helm. Conceptually the corporation is intact but the Augean stables, if indeed they be, remained uncleansed. We therefore see no merit to the claim that Berkshire or Ludwig should indemnify American because of its debt to the plaintiffs who have realistically conferred no benefit at all upon American.

We do not ignore the contention that Ludwig and Berkshire are directly responsible to the plaintiffs on the theory that a court may award attorney's fees in favor of a party who is forced to litigate by reason of the vexatious, wanton conduct of a defendant who brings an unfounded action or presents an unfounded defense. See Stolberg v. Board of Trustees, 474 F.2d 485 (2d Cir. 1973) and Kahan v. Rosensteil, 424 F.2d 161 (3d Cir.), cert. denied, 398 U.S. 950, 90 S.Ct. 1870, 26 L.Ed.2d 290 (1970). Judge Mansfield's recent opinion in *Stolberg* reviews the unusual circumstances which authorize the award of counsel fees. In that case, he emphasized that suit was compelled by the defendant's recalcitrant conduct, 474 F.2d at 490. As we have pointed out, the administrative proceeding here was prompted by the statute. The appearance of plaintiffs was compelled by their substantial interest in the price to be fixed for the stock. The extensive participation of LLB was voluntary and, as we have already noted, we cannot assume that the SEC would have failed to act without it. The fraud charged was not for the purpose of abusing process and forcing unnecessary litigation but to freeze out the public stockholders.

■ We are left then with the claim that the plaintiffs' intervention enriched the minority stockholders and therefore a *quantum meruit* recovery is authorized. In addition to the grounds already set forth, we find in any event no precedent for a recovery on this basis. We agree with appellant that its failure to establish a fund or to appear for a class does not automatically bar a recovery. The fact that minority stockholders did not retain or expressly rejected LLB's representation is not necessarily

fatal. See Sprague v. Ticonic National Bank, 307 U.S. 161, 59 S.Ct. 777, 83 L. Ed. 1184 (1939). However, in the cases where the activity of counsel has produced no fund, it has at least resulted in either the establishment of a principle of law which necessarily established a recovery for those who allegedly benefitted or at least contributed to general corporate therapeutics by disclosing a fraud that otherwise would have gone undetected. This plaintiffs have failed to establish. In *Ticonic, supra,* a private litigant established her right to funds which she had deposited in a bankrupt institution. The court stated:

> In her main suit the petitioner neither avowed herself to be the representative of a class nor did she automatically establish a fund in which others could participate. But in view of the consequences of *stare decisis*, the petitioner by establishing her claim necessarily established the claims of fourteen other trusts pertaining to the same bonds. 307 U.S. at 166, 59 S.Ct. at 780.

Since the SEC proceeding was terminated here by withdrawal of the application for exemption, LLB established no violation of the Securities acts and created no fund for the benefit of the minority stockholders. At best, LLB succeeded in prodding Berkshire-Ludwig over a two year period from an offer of $275 to $650 per share. But the offer was never accepted and no valuation binding upon the offeror was ever established. Thus, in this case, the Weininger appellees sold their American stock to Berkshire at the $275 per share offer in October, 1967 with the understanding that if any other shareholder within a year received a higher price or if the SEC ordered a higher price in the 17(b) proceeding, they would receive the difference. Since neither eventuality occurred they were not entitled to additional sums and Berkshire instead offered to rescind the agreement. Weininger then commenced an action in February, 1970 (Weininger v. National Bulk Carriers, 70 Civ. 610 (S.D.N.Y.) ) to recover damages under the federal Securities laws.

In 1972, after extensive discovery, the action was settled at less than $635 per share with Weininger expending some $108,500 in counsel fees plus additional amounts for disbursements. LLB had not established any statutory violation which automatically inured to their benefit.

The offer by Berkshire-Ludwig obviously failed to establish any market value under the circumstances and to now assess additional counsel fees upon unwilling minority stockholders who were forced to lengthy and expensive litigation to achieve any benefit, does not particularly appeal to this court of equity.

In conclusion, we find not only that there is no precedent for the award here sought but in fact that there are policy considerations against it. Aside from the lack of special circumstances calling for the intervention of a private attorney general as well as the difficulty of assessing the value of the putative benefit here, we would face the impossible task of attempting to measure the value of the service of the intervenor. A precedent here would encourage intervention in comparable cases not only before the SEC but other agencies as well. The competition and maneuvering among counsel to assume the lead role would not only be disruptive of administrative procedures but might very well encourage agency inaction. The SEC was here charged with a responsibility and it presumably has the expertise to make the assessment required by the statute. The introduction of additional cooks might not only spoil the broth but paralyze the chef. See Casey v. Woodruff, 49 N.Y.S.2d 625, 648 (Sup.Ct. 1944). A district court would be hard put to determine the value of the contributions of each in a subsequent action far removed from the agency proceeding. If in fact the role of the SEC in these cases is or becomes perfunctory then the statute might be amended to provide for legal fees to be fixed by the agency which has conducted the proceeding and which is in a much better posi-

tion to estimate the value of the intervenor's contribution. As Judge Kaufman pointed out in Greene County Planning Board v. FPC, 455 F.2d 412, 427 (2d Cir.), cert. denied, 409 U.S. 849, 93 S.Ct. 56, 34 L.Ed.2d 90 (1972), in somewhat comparable circumstances:

> Fully mindful that petitioners invoke our equitable powers, we cannot ignore parallel developments in this rapidly changing area of administrative law. As recently as December 7, 1971, the Administrative Conference of the United States refused to adopt a recommendation which would have endorsed the principle of reimbursing the legal expenses incurred by intervenors in administrative proceedings. . . . Recommendation 28, Public Participation in Administrative Hearings § D, adopted December 7, 1971. Without a showing of compelling need, it would be premature for us to inject the federal courts into this area of administrative discretion, perhaps foreclosing more flexible approaches through agency action or rules.

For those reasons we affirm the judgment below dismissing the complaint for failure to state a cause of action.