DRISCOLL et al., constituting PENNSYLVANIA PUBLIC UTILITY COMM'N, et al. *v.* EDISON LIGHT & POWER CO.

No. 509.   Argued February 7, 8, 1939.—Decided April 17, 1939.

---

[13] *Buck* v. *Case,* 24 F. Supp. 541, 549.
[14] 299 U. S. 269.

*Messrs. Guy K. Bard* and *Edward Knuff,* with whom
*Messrs. Claude T. Reno,* Attorney General of Pennsyl-
vania, and *Samuel Graff Miller, John C. Kelley, Harry
H. Frank,* and *Herbert S. Levy* were on the brief, for
appellants. *Mr. Herbert B. Cohen* was on a brief for the
Utility Consumers' League of York, Pa., appellant.

*Mr. Clarence W. Miles,* with whom *Messrs. Walter
Biddle Saul, Edward F. Huber, Bradford S. Magill,* and
*J. Harry La Brum* were on the brief, for appellee.

By leave of Court, briefs of *amici curiae* were filed by
*Solicitor General Jackson, Assistant Attorney General
Arnold,* and *Messrs. Paul A. Freund, Robert M. Cooper,
Milford Springer, David W. Robinson, Jr., Richard J.*

*Connor, Charles W. Smith, William J. Dempsey,* and *William C. Koplovitz,* on behalf of the United States; and by *Messrs. Gay H. Brown* and *Sherman C. Ward,* on behalf of the Public Service Commission of the State of New York, urging the constitutionality of the temporary-rate provision of the Pennsylvania statute.

MR. JUSTICE REED delivered the opinion of the Court.

This is an appeal from the decree of a three-judge district court granting a permanent injunction against the enforcement of temporary rates. § 266, Jud. Code.

The appellants are five named persons, individually and as members of the Pennsylvania Public Utility Commission, and the Utility Consumers League of York, Pennsylvania, intervening defendant below, an unincorporated association of consumers of electric current in the territory served by the appellee. The latter is a public utility corporation organized under the laws of Pennsylvania, which generates, transmits, distributes and sells electric energy to approximately 30,000 customers in and about York, Pennsylvania.

An investigation to determine the reasonableness of appellee's rates was instituted on January 27, 1936. During its progress the state legislature recodified the utility law of Pennsylvania. Act of May 28, 1937, P. L. 1053, Purdon's Pa. Stat. Ann., 1938 Supp., Title 66, § 1101 *et seq.* It enacted a temporary rate section, 310, which is the source of this controversy.

Acting under § 310, the commission, after notice and argument, issued a temporary rate order on July 13, 1937, requiring the utility to file rate schedules which would effect a reduction of approximately $435,000 in annual gross operating revenues. This order was replaced by another on July 27, 1937, which commanded an identical reduction. This time the commission itself prescribed a

schedule of rates. The utility filed a bill in equity in a statutory court in the Middle District of Pennsylvania. On October 15, 1937, a permanent injunction issued.[1] The Commission did not appeal. On November 30, 1937, another order was issued seeking to establish the same temporary rates and to secure the same reduction in gross revenues as the orders of July 13 and 27.

On December 14, 1937, the utility filed a bill in the United States District Court for the Eastern District of Pennsylvania to enjoin this order. A three-judge court was convened under § 266 of the Judicial Code. By stipulation of the parties the application for an interlocutory injunction brought to hearing on January 17, 1938, was treated as an application for a permanent injunction. On October 14, 1938, a permanent injunction issued.

The court concluded as a matter of law that the utility had no plain, speedy and adequate remedy in the state courts; that the order is void because the "commission acted in direct violation of the mandatory provisions of the Public Utility Act which requires rates for [the company] to be fixed under paragraph (b) of section 310"; that the order is unconstitutional because (1) it violates the procedural requirements of due process, (2) it fails to permit the utility to earn a fair return on the fair value of its property used and useful in the public service, (3) it confiscates the company's property, and (4) it is not supported by substantial evidence.[2]

*Jurisdiction of the Statutory Court.*—Except as modified by the Johnson Act,[3] jurisdiction exists in a statutory court, called pursuant to § 266 of the Judicial Code, to hear and finally determine bills in equity seeking tem-

---

[1] *Edison Light & Power Co.* v. *Driscoll*, 21 F. Supp. 1.

[2] *Edison Light & Power Co.* v. *Driscoll*, 25 F. Supp. 192.

[3] Judicial Code, § 24 (1), as amended by Act of May 14, 1934, c. 283, 48 Stat. 775.

porary and permanent injunctions against the order of a state administrative commission on the ground of irreparable injury.[4] By this amendatory act, where the order attacked as violative of the Federal Constitution affects the rates of a public utility, does not interfere with interstate commerce and has been made after notice and hearing, the jurisdiction of the district court to enjoin its enforcement is withdrawn, unless no "plain, speedy and efficient remedy may be had, at law or in equity, in the courts of such State." No challenge to the jurisdiction was made in the statutory court or on appeal. In response to questions from the bench, counsel for the commission conceded that there was no remedy in the state courts which would satisfy the Johnson Act.

The reason for this concession lies, so far as a remedy in equity is concerned, in the provision of the Pennsylvania statute forbidding an injunction against an order, "except in a proceeding questioning the jurisdiction of the commission."[5] The bill in certain allegations attacks the section of the Public Utility Law under which this order issued as violative of the Fourteenth Amendment in that it empowered the commission to fix noncompensatory and discriminatory temporary rates, in an arbitrary manner. In one sense this questions the ju-

---

[4] *Oklahoma Gas Co.* v. *Russell,* 261 U. S. 290, 292; *Herkness* v. *Irion,* 278 U. S. 92, 93.

[5] § 1111, P. L. 1053, Purdon's Pa. Stat. Ann., 1938 Supp., Title 66, § 1441: "Exclusive jurisdiction of Dauphin County Court to hear injunctions.—No injunction shall issue modifying, suspending, staying, or annuling any order of the commission, or of a commissioner, except in a proceeding questioning the jurisdiction of the commission, and then only after cause shown upon a hearing. The court of common pleas of Dauphin County is hereby clothed with exclusive jurisdiction throughout the Commonwealth, of all proceedings for such injunctions, subject to an appeal to the Superior Court as aforesaid."

risdiction of the commission. If § 310 is invalid, there is no other provision to authorize temporary rates. Jurisdiction is a word of uncertain meaning. As used in § 1111, *supra,* it apparently refers to proceedings by the commission under the terms of the statute. In this use it would permit an injunction, equitable grounds being shown, where the public utility is not covered by the act. Otherwise, action in excess of the powers of the commission, such as a confiscatory rate, might be deemed beyond its jurisdiction. At any rate, without an authoritative determination by the state courts, we cannot say, for this character of proceeding, that the remedy in the state courts is plain, speedy and efficient.[6] The remedy at law by appeal is ineffective to protect the utility's position *pendente lite.* The supersedeas does not postpone the application of the temporary rates.[7] The statutory court had jurisdiction of the bill.

*Statutory Basis for the Order.*—Sec. 310 [8] contains several subsections. The commission fixed the temporary rates under subsection (a). The district court concluded as a matter of law that this action was invalid because they could only be fixed under subsection (b). The two subsections are set out below.[9] In its opinion, without

---

[6] *Mountain States Co.* v. *Comm'n,* 299 U. S. 167, 170; *Corporation Comm'n* v. *Cary,* 296 U. S. 452.

[7] § 1103, P. L. 1053, Purdon's Pa. Stat. Ann., 1938 Supp., Title 66, § 1433.

[8] P. L. 1053, Purdon's Pa. Stat. Ann., 1938 Supp., Title 66, § 1150.

[9] "Temporary Rates.—(a) The commission may, in any proceeding involving the rates of a public utility brought either upon its own motion or upon complaint, after reasonable notice and hearing, if it be of opinion that the public interest so requires, immediately fix, determine, and prescribe temporary rates to be charged by such public utility, pending the final determination of such rate proceeding. Such temporary rates, so fixed, determined, and prescribed, shall be sufficient to provide a return of not less than five per centum upon the original cost, less accrued depreciation, of the physical

discussing § 310 (b), the court declared § 310 (a) uncon-
stitutional because it permitted the commission to fix
a temporary rate based upon the single factor of origi-
nal cost less depreciation.[10]  The commission, however,
did not confine itself to that one element in setting the
fair value of the appellee's property, for the purpose of
temporary rates, at $5,250,000.  It gave weight to repro-
duction cost, original cost, going concern value and the
necessity for working capital, and it allowed on this rate
base a return of more than six per cent.  This, of course,

property (when first devoted to public use) of such public utility,
used and useful in the public service, and if the duly verified reports
of such public utility to the commission do not show such original
cost, less accrued depreciation, of such property, the commission may
estimate such cost less depreciation and fix, determine, and prescribe
rates as hereinbefore provided.

"(b) If any public utility does not have continuing property
records, kept in the manner prescribed by the commission, under the
provisions of section five hundred two of this act, then the commis-
sion, after reasonable notice and hearing, may establish temporary
rates which shall be sufficient to provide a return of not less than an
amount equal to the operating income for the year ending December
thirty-first, one thousand nine hundred thirty-five, or such other
subsequent year as the commission may deem proper, to be deter-
mined on the basis of data appearing in the annual report of such
public utility to the commission for the year one thousand nine
hundred thirty-five, or such other subsequent year as the commis-
sion may deem proper, plus or minus such return as the commission
may prescribe from time to time upon such net changes of the
physical property as are reported to and approved for rate-making
purposes by the commission.  In determining the net changes of the
physical property, the commission may, in its discretion, deduct
from gross additions to such physical property the amount charged
to operating expenses for depreciation or, in lieu thereof, it may
determine such net changes by deducting retirements from the gross
additions: Provided, That the commission, in determining the basis
for temporary rates, may make such adjustments in the annual report
data as may, in the judgment of the commission, be necessary and
proper."

[10] *Edison Light & Power Co.* v. *Driscoll*, 25 F. Supp. 192.

satisfies the requirement of § 310 (a) that the temporary rates shall produce not less than 5% on the "original cost, less accrued depreciation."

Appellee's first contention is that the decree may be sustained for the sole reason that the commission should have proceeded under subsection (b) because the appellee does not have continuing property records. As the conclusion of the lower court on this point is not supported by a state decision, we analyze for ourselves the provisions of the sections. It is clear from the language of § 310 (a) that it is applicable not only to public utilities whose reports to the commission show the original cost of their physical property but also to those whose original cost is not so shown. The last clause of the section authorizes the commission to estimate such cost. There is no provision in 310 (a) which limits its application to those utilities which maintain the continuing property records of § 502.[11] Section 310 (b), see note 9, furnishes a partial alternative for § 310 (a). Where there are no continuing property records, as provided by § 502, the commission must in fixing the temporary rate arrange for at least a five per cent return on original cost under (a) or the return of an operating income under (b) equal to that for the year 1935 or a subsequent year, as determined by the commission.

[11] P. L. 1053, Purdon's Pa. Stat. Ann., 1938 Supp., Title 66, § 1212. "Continuing property records.—The commission may require any public utility to establish, provide, and maintain as a part of its system of accounts, continuing property records, including a list or inventory of all the units of tangible property used or useful in the public service, showing the current location of such property units by definite reference to the specific land parcels upon which such units are located or stored; and the commission may require any public utility to keep accounts and records in such manner as to show, currently, the original cost of such property when first devoted to the public service, and the reserve accumulated to provide for the depreciation thereof."

Appellee urges next that the section permits the commission to disregard present cost, depreciate original cost, omit indirect and overhead items of construction, and exclude allowances for working capital or going concern value. Although these items were considered by the commission, the appellee contends that the order is invalid because § 310 (a) might have been complied with by providing a return of 5% on the original cost depreciated. The argument seems to be that a statute which permits an unconstitutional determination is invalid, even though it is actually applied in a constitutional manner.[12]

The commission drew the order in accord with the prior ruling of the Middle District Court on a former order in this rate proceeding.[13] The former order had also fixed temporary rates but had not set out the findings of value deemed essential by the court. Although the reversal of the commission's order had actually turned on the failure to show the factual basis for the rates, as the district court had stated that compliance with *Smyth* v. *Ames*[14] was necessary in temporary rate making, the commission based the order now under review on evidence requisite under that rule. By taking this position, it interprets the statute as requiring consideration of elements other than original cost in fixing temporary rates. It is not suggested that the commission omitted consideration of any necessary element in the present order. If we assume with the appellee that the constitutionality of a

[12] Cf. *Panama Refining Co.* v. *Ryan*, 293 U. S. 388, 420; *Wuchter* v. *Pizzutti*, 276 U. S. 13, 24; *People* v. *Klinck Packing Co.*, 214 N. Y. 121, 138; 108 N. E. 278; *Montana Company* v. *St. Louis Mining Co.*, 152 U. S. 160, 170. But see *Hatch* v. *Reardon*, 204 U. S. 152, 160; *Tyler* v. *Judges*, 179 U. S. 405, 410; *Jacobson* v. *Massachusetts*, 197 U. S. 11, 37; *Lieberman* v. *Van De Carr*, 199 U. S. 552, 562; *Home Telephone Co.* v. *Los Angeles*, 211 U. S. 265, 278.

[13] *Edison Light & Power Co.* v. *Driscoll*, 21 F. Supp. 1.

[14] 169 U. S. 466.

delegation of rate making authority is to be tested by what a rate making body may rightfully do under the delegation rather than what it does, appellee's case is advanced not one whit. We have here an interpretation of the Pennsylvania statute by the board charged with its enforcement that it must weigh all the essential elements of valuation required by our past decisions.

There is nothing in the language of § 310 (a) which requires a different construction. The commission is authorized to fix temporary rates. There is no requirement as to how the rates are to be determined, except that they shall be sufficient to return a given minimum—not less than 5% on the original cost, less depreciation. The language authorizing the fixing of temporary rates is cast, except as to the limitation just referred to, in much the same pattern as the language of § 309 authorizing the determination of permanent rates. The latter section reads: ". . . the commission shall determine the just and reasonable rates . . ." A different construction would raise the novel and important question of the constitutionality of a temporary rate, based solely on depreciated original cost, with provision for recoupment of the loss from insufficient temporary rates.[15] In the absence of an

---

[15] "(e) Temporary rates so fixed, determined, and prescribed under this section shall be effective until the final determination of the rate proceeding, unless terminated sooner by the commission. In every proceeding in which temporary rates are fixed, determined, and prescribed under this section, the commission shall consider the effect of such rates in fixing, determining, and prescribing rates to be thereafter demanded or received by such public utility on final determination of the rate proceeding. If, upon final disposition of the issues involved in such proceeding, the rates as finally determined, are in excess of the rates prescribed in such temporary order, then such public utility shall be permitted to amortize and recover, by means of a temporary increase over and above the rates finally determined, such sum as shall represent the difference between the gross income obtained from the rates prescribed in such tem-

authoritative state decision, we áre reluctant to accept a construction which brings forward that issue, particularly when the case may reasonably be determined upon the interpretation of the officials of the state charged with the administration of the act.[16] This course observes the very salutary rule that "this Court will not decide an issue of constitutionality if the case may justly and reasonably be decided under a construction of the statute under which the act is clearly constitutional." [17]

*Confiscation.*—There remains for examination the appellee's argument that the decree of the district court enjoining the enforcement of the order should be sustained because it is confiscatory. The commission, as of November 30, 1937, found the rate base, revenue, expenses and rate, as set out below.[18] Appellee urges here that the commission's figures are erroneous in the following particulars: (1) The rate base should be $5,866,081; (2) the rate should be $7\frac{1}{2}$ per cent; (3) two items of expense, disallowed by the commission should be added to the operating expenses, (a) some increase in annual salaries and (b) rate case expenses on books to November

porary order and the gross income which would have been obtained under the rates finally determined if applied during the period such temporary order was in effect." Cf. *Prendergast* v. *New York Telephone Co.*, 262 U. S. 43; *Bronx Gas & Electric Co.* v. *Maltbie*, 271 N. Y. 364; 3 N. E. 2d 512.

[16] *Fox* v. *Standard Oil Co.*, 294 U. S. 87, 97; *Union Ins. Co.* v. *Hoge*, 21 How. 35, 66.

[17] *Thompson* v. *Consolidated Gas Corp.*, 300 U. S. 55, 75–76, and cases cited; cf. *Blodgett* v. *Holden*, 275 U. S. 142, 148; *Federal Trade Comm'n* v. *American Tobacco Co.*, 264 U. S. 298, 307; *Texas* v. *Eastern Texas R. Co.*, 258 U. S. 204, 217.

[18] Rate Base or Fair Value of Property_____ $5,250,000.00
Rate of return 6%.
Required return_____ 315,000.00
Revenue after Reduction_____ $1,767,329.00
Operating Expenses_ $1,033,898.00
Taxes_____ 206,400.00
Annual Depreciation _____ 142,531.00  1,382,829.00
Estimated Return_____ 384,500.00

15, 1937; (4) allowance should be made for a prospective loss of annual profit by reason of the loss of a large customer, through abandonment of railway service by York Railways Company.

(1) The commission estimated the original cost as of December 31, 1936, at $4,576,169.73. The company estimated the original cost as of November 30, 1936, exclusive of financing charges, at $4,619,364.00 and its book cost as of December 31, 1936, at $4,578,793.00. If, to the highest of these items, we add $164,000 for working capital and $142,851.07, representing net additions to September 30, 1937, the amounts claimed by the company, the original cost rate base is found to be not more than $4,926,215.07.

The commission excluded the cost of financing because there was no evidence of any actual expenditures for such purpose or of any studies of such cost. We find no error in this.[19] There was here no foundation for an estimate.[20] Appellee's suggestion that evidence supporting its claim is found in the capitalization chart of York Railways Company, the owner of appellee's common stock, is not accepted. This shows the discount, $298,-825.00, paid by the parent company on $2,706,000 face amount of bonds of various issues between 1909 and 1925. It appears that $1,027,904 of the proceeds was expended for construction work of the York Edison Company, apparently appellee's predecessor. Nothing is shown as to the cost of this money to the appellee. It may have given notes for or been charged with this exact amount, without a finance charge. The financing cost to appellee may have been covered by the interest rate.

[19] *Wabash Valley Elec. Co.* v. *Young*, 287 U. S. 488, 500; *Galveston Electric Co.* v. *Galveston*, 258 U. S. 388, 397.

[20] Cf. *Dayton P. & L. Co.* v. *Comm'n*, 292 U. S. 290, 309–10; *Los Angeles Gas Co.* v. *Railroad Comm'n*, 289 U. S. 287, 310.

The commission made no specific allowance for going concern value. It did, however, state that it had weighed the going concern value with other factors to determine fair value. It gave practical effect to this consideration when it fixed fair value several hundred thousand dollars in excess of its average of original and reproduction cost, both depreciated. In the computations by the company of original and reproduction costs, allowances were made for the overhead expense of creating the aggregate of land, buildings, and equipment, making up the utility. No tangible evidence of any unusual situation justifying any definite further allowance appears in the testimony of appellee's witness Seelye. The plant of the utility without the utilization of its production by the community would be of little value. Expenditures to secure customers through advertisement and solicitation, as well as to install connections do not appear separate from the ordinary operating and construction costs. The appellee points to the character of the territory served, the company's ability to earn, the efficiency of the management, the adequate available power supply and the excellent capital structure as indicative of a going concern value above tangible property plus overhead. To appraise these elements apart from and in addition to reasonable cost figures would require evidence of a failure on the part of the commission to give reasonable weight to these factors. This evidence is lacking here.[21]

For depreciated reproduction cost as of November 30, 1936, the commission accepted the estimate of the company for direct costs, $3,981,347. It added 19%, $756,456,

---

[21] *Denver Stock Yard Co.* v. *United States*, 304 U. S. 470, 478; *St. Joseph Stock Yards Co.* v. *United States*, 298 U. S. 38, 62. Cf. *Dayton P. & L. Co.* v. *Comm'n*, 292 U. S. 290, 308; *St. Joseph Stock Yards Co.* v. *United States*, 11 F. Supp. 322, 334; *Des Moines Gas Co.* v. *Des Moines*, 238 U. S. 153; *McCardle* v. *Indianapolis Co.*, 272 U. S. 400, 413.

for indirect costs and reached a total of $4,737,803. This finding reduced the indirect costs from the 24.3 per cent claimed by the company. Evidence was introduced before the commission supporting each percentage estimate. The amount of these indirect costs likely to be incurred is too uncertain for us to conclude that the percentage adopted is erroneous.[22] We cannot see that the failure of the commission's witness Bierman to inspect the property made less valuable his estimate on the proper percentage to be applied for indirect costs. These indirect costs are of the character of interest, supervision, cost of financing, taxes and legal expense.

The utility states that the commission, in fixing the reproduction cost, erred by refusing to consider the effect of a claimed increase of prices. The commission, on November 30, 1937, fixed reproduction cost upon a computation based by the utility upon prices as of November 30, 1936. This showed a gross cost of $5,572,134, depreciated and reduced by the commission, as explained in the preceding paragraph, to $4,737,803. The utility presented a further computation, showing as of May 31, 1937, that increased prices, due to a rising level, would increase the gross cost to $6,019,832. The argument is that the later estimate should have been considered.[23] Proportionally reduced to accord with the action of the commission, this latter figure would become $5,118,465. If to this higher reproduction cost we add working capital, there appears a reproduction cost depreciated figure of $5,282,465.

It is furthermore to be observed that the commission's figures do not differ far as to fair value, from the estimate of an important witness for the utility, Mr. Seelye, who testified on March 12, 1937, that the fair value was not less than $5,500,000 and said later in answer to the com-

[22] *Dayton P. & L. Co.* v. *Comm'n*, 292 U. S. 290, 311.
[23] *McCart* v. *Indianapolis Water Co.*, 302 U. S. 419.

missioner's question that the fair value, in his opinion, was $5,500,000. This estimate was reiterated on December 20, 1937, in the affidavits of Mr. Seelye and Mr. Wayne, the President of the company, in support of the motion for temporary injunction.

For the purpose of passing upon the issue of confiscation in the temporary rates, we shall accept $5,500,000 as the fair value of the property as of November 30, 1937.

(2) The rate of return was fixed by the commission at six per cent. Witnesses for the utility brought out facts deemed applicable in the determination of a proper rate of return on the fair value of the property. Their evidence took cognizance of the yield of bonds, preferred and common stocks of selected comparable utilities, the stagnant market for new issues, prevailing cost of money, the implications of the possible substitution of some governmentally operated or financed utilities for those privately owned and the dangers of a fixed schedule of rates in the face of possible inflation. From these factors they deduced that a proper rate of return would be from 7.8 per cent to 8 per cent. An accounting expert of the commission countered with tables showing yields of bonds of utilities; the yield to maturity of Pennsylvania public utility securities, approved by the commission between July 1, 1933, and May 7, 1937, long term and actually sold for cash to non-affiliated interests; yield of Pennsylvania electric utilities; financial and operating statistics of Pennsylvania electric utilities; money rates, and other material information. He concluded 5.5 per cent was a reasonable rate of return.

It must be recognized that each utility presents an individual problem.[24] The answer does not lie alone in

[24] *United Railways* v. *West*, 280 U. S. 234, 249; *Willcox* v. *Consolidated Gas Co.*, 212 U. S. 19, 48; *Bluefield Co.* v. *Public Service Comm'n*, 262 U. S. 679, 692; *Knoxville* v. *Water Co.*, 212 U. S. 1, 17.

average yields of seemingly comparable securities or even in deductions drawn from recent sales of issues authorized by this same commission. Yields of preferred and common stocks are to be considered, as well as those of the funded debt. When bonds and preferred stocks of well seasoned companies can be floated at low rates, the allowance of an over all rate return of a modest percentage will bring handsome yields to the common stock. Certainly the yields of the equity issues must be larger than that for the underlying securities. In this instance, the utility operates in a stable community, accustomed to the use of electricity and close to the capital markets, with funds readily available for secure investment. Long operation and adequate records make forecasts of net operating revenues fairly certain. Under such circumstances a six per cent return after all allowable charges cannot be confiscatory.

(3) and (4). The utility urges that two items of expense and a prospective loss should be added to the operating expenses, allowed by the commission, of $1,382,-829. The most important of these items is the rate case expenses. The company by its Exhibit 21 shows these incurred to November 15, 1937, to be $178,374.50. The commission from Exhibit 23 found them to be $127,935 for the twelve months ending September 30, 1937. The difference probably comes from the expenses before and after the period considered by the commission. We assume the higher figures to be correct. As the commission concluded that the prior rates of the company were obviously excessive, it allowed nothing for expense in defending them. Consequently there is no discussion of the reasonableness of the amount of the company's charge and we accept them as reasonable. Even where the rates in effect are excessive, on a proceeding by a commission to determine reasonableness, we are of the view that the utility should be allowed its fair and proper

expenses for presenting its side to the commission. We do not refer to expense of litigation in the courts. "A different case would be here if the company's complaint had been unfounded or if the cost of the proceeding had been swollen by untenable objections." [25]

In the allowance of these expenses, the period over which they are to be amortized will depend upon the character of services received or disbursements made. There could rarely be an anticipation of annually recurring charges for rate regulation. Under the circumstances here presented where full statistics on investment, inventory and labor requirements have been made which, as cumulated, will form largely the basis of all future negotiations, we are of the opinion that amortization over a ten year period is reasonable.[26] As such an adjustment produces an estimated return very close to the reasonable rate, even with the addition to the operating expenses of the other items of increased salaries, $20,593, and prospective loss of annual profit, $15,089, we do not enter into a discussion of them. Experience will add its weight to the other evidence on further hearing. The note below shows the calculation.[27]

At best, these estimates are prophecies of expected returns. The incalculable factors of business activity, un-

---

[25] *West Ohio Gas Co.* v. *Comm'n* (No. 1), 294 U. S. 63, 74; see *Wabash Valley Elec. Co.* v. *Young*, 287 U. S. 488, 500.

[26] *Wabash Valley Elec. Co.* v. *Young*, 287 U. S. 488, 500; *West Ohio Gas Co.* v. *Comm'n* (No. 1), 294 U. S. 63, 74.

[27] Compare with the computation of the Commission, note 18.

| | | |
|---|---|---|
| Rate Base or Fair Value of Property | | $5,500,000.00 |
| Rate of return 6%. | | |
| Required return | | 330,000.00 |
| Revenue after Reduction | $1,767,329.00 | |
| Operating Expenses | $1,033,898.00 | |
| Taxes | 206,400.00 | |
| Annual Depreciation | 142,531.00 | |
| Rate Expense, 10-year Amortization | 17,838.00 | |
| Salary Increase | 20,593.00 | |
| Prospective Loss | 15,089.00 | 1,436,349.00 |
| Estimated Return | | 330,980.00 |

anticipated demand or forbearance, substitution and other variables lead us to approximations. We are satisfied the reduction required is not shown to be confiscatory.

*Reversed.*

MR. JUSTICE FRANKFURTER, concurring.

The decree below was clearly wrong. But in reversing it, the Court's opinion appears to give new vitality needlessly to the mischievous formula for fixing utility rates in *Smyth* v. *Ames,* 169 U. S. 466. The force of reason, confirmed by events, has gradually been rendering that formula moribund by revealing it to be useless as a guide for adjudication. Experience has made it overwhelmingly clear that *Smyth* v. *Ames* and the uses to which it has been put represented an attempt to erect temporary facts into legal absolutes. The determination of utility rates—what may fairly be exacted from the public and what is adequate to enlist enterprise—does not present questions of an essentially legal nature in the sense that legal education and lawyers' learning afford peculiar competence for their adjustment. These are matters for the application of whatever knowledge economics and finance may bring to the practicalities of business enterprise. The only relevant function of law in dealing with this intersection of government and enterprise is to secure observance of those procedural safeguards in the exercise of legislative powers which are the historic foundations of due process.

Mr. Justice Bradley nearly fifty years ago made it clear that the real issue is whether courts or commissions and legislatures are the ultimate arbiters of utility rates, (dissenting, in *Chicago, M. & St. P. Ry. Co.* v. *Minnesota,* 134 U. S. 418, 461). Whatever may be thought of the wisdom of a broader judicial rôle in the controversies between public utilities and the public, there can be no

doubt that the tendency, for a time at least, to draw fixed rules of law out of *Smyth* v. *Ames* has met the rebuff of facts. At least one important state has for decades gone on its way unmindful of *Smyth* v. *Ames,* and other states have by various proposals sought to escape the fog into which speculations based on *Smyth* v. *Ames* have enveloped the practical task of administering systems of utility regulation.

*Smyth* v. *Ames* should certainly not be invoked when it is not necessary to do so. The statute under which the present case arose represents an effort to escape *Smyth* v. *Ames* at least as to temporary rates. It is the result of a conscientious and informed endeavor to meet difficulties engendered by legal doctrines which have been widely rejected by the great weight of economic opinion,[1] by authoritative legislative investigations,[2] by utility commissions throughout the country,[3] and by impressive judicial dissents.[4] As a result of this long process of experience and reflection, the two states in which utilities play the biggest financial part—New York and Pennsylvania—. have evolved the so-called recoupment scheme for temporary rate-fixing (thereby avoiding some of the most

[1] See 2 BONBRIGHT, THE VALUATION OF PROPERTY, 1081–1086, 1094–1102; 3A SHARFMAN, THE INTERSTATE COMMERCE COMMISSION, 121–137.

[2] N. Y. State Commission on Revision of the Public Service Commission Law, *Report of Commissioners, passim* (1930).

[3] Proceedings of the Forty-Seventh Annual Convention of the National Association of Railroad and Utilities Commissioners, 232 *et seq.;* Proceedings of the Forty-Eighth Annual Convention of the National Association of Railroad and Utilities Commissioners, 115 *et seq.,* 289 *et seq.;* Proceedings of the Forty-Ninth Annual Convention of the National Association of Railroad and Utilities Commissioners, 159 *et seq.*

[4] See, e. g., Brandeis, J., concurring, in *Missouri ex rel. Southwestern Bell Telephone Co.* v. *Public Service Comm'n,* 262 U. S. 276, 289, and bibliography therein contained.

wasteful aspects of rate litigation) as a fair means of accommodating public and private interests. It is a carefully guarded device for securing "a judgment from experience as against a judgment from speculation," *Tanner* v. *Little,* 240 U. S. 369, 386, in dealing with a problem of such elusive economic complexity as the determination of what return will be sufficient to attract capital in the special setting of a particular industry and at the same time be fair to the public dependent on such enterprise.

That this Court should not "decide an issue of constitutionality if the case may justly and reasonably be decided under a construction of the statute under which the act is clearly constitutional" is, as an abstract proposition, basic to our judicial obligation. But this is not a formal doctrine of self-restraint. Its rationale is avoidance of conflict with the legislature. The opinion from which the preceding quotation is taken and the decisions to which it refers are all cases in which constitutionality was in obvious jeopardy. It is one thing to avoid unconstitutionality even at the cost of a tortured statutory construction. It is quite another to recognize the validity of a statute directed expressly to the situation in hand and so employed by the state authorities, when constitutionality of that statute is as incontestably clear as the decision of the New York Court of Appeals has demonstrated it to be in sustaining the sister statute of the Pennsylvania Act, *In the Matter of Bronx Gas & Electric Co.* v. *Maltbie,* 271 N. Y. 364; 3 N. E. 2d 512. The Court's opinion in the present case does not avoid issues of constitutionality. It accepts the much more dubious constitutional doctrines of *Smyth* v. *Ames* and its successors to solve the very easy constitutional issues raised by the Pennsylvania Act.

MR. JUSTICE BLACK concurs in the above views.