CONGRESS OF RAILWAY UNIONS
et al., Plaintiffs,

v.

James D. HODGSON, Secretary of Labor
et al., Defendants.

POTOMAC PASSENGERS ASSOCIA-
TION, Plaintiffs,

v.

CHESAPEAKE AND OHIO RAILWAY
COMPANY et al., Defendants.

CONGRESS OF RAILWAY UNIONS
et al., Plaintiffs,

v.

BURLINGTON NORTHERN, INC. et al.,
Defendants.

Civ. A. Nos. 825–71, 842–71 and 843–71.

United States District Court,
District of Columbia.

April 30, 1971.

William G. Mahoney, Washington, D. C., for Congress of Railway Unions and Railway Labor Executives' Assn.

Francis M. Shea, and Richard T. Conway, Washington, D. C., for defendant railroads.

William O. Bittman, Washington, D. C., for Amtrak.

Stuart E. Schiffer, for defendant Secretary of Labor.

Pierre E. Dostert, Washington, D. C., for Potomac Passengers Assn.

Robert O. Smith, Jr., Baltimore, Md., for defendants, Chesapeake & Ohio Ry. Co. and others.

Andrew P. Goldstein, Washington, D. C., for plaintiffs Congress of Railway Unions and others.

CORCORAN, District Judge.

## I.

Reacting to an ever worsening rail-passenger crisis, Congress enacted the Rail Passenger Service Act of 1970 (hereinafter the "Act").[1]

In brief, the Act authorized the formation of a National Railroad Passenger Corporation (hereinafter "Amtrak"). (Accomplished) It directed the Secretary of Transportation to designate a so-called "basic system" of intercity rail passenger service for the whole country (accomplished) and envisaged that passenger service over any lines not included in the basic system would be discontinued. As to these lines included in the basic system any railroad is permitted to enter into a contract with Amtrak whereunder Amtrak will assume the burden of operating the service and the railroad in turn will be relieved of its entire responsibility for providing intercity passenger service, including those lines not assumed by Amtrak.

Section 401(a) (1) of the Act provides that any Amtrak-railroad contract must include "protective arrangements for employees" of a contracting railroad, and Section 405(b) specifically provides that such protective benefits shall not be "less than those established pursuant to section 5(2) (f) of the Interstate Commerce Act."

1.  Pub.L. No. 91-518, 84 Stat. 1327 (Oct. 30, 1970).

2.  By Court order of April 27, 1971 the Penn Central was given permission to enter into a contract with Amtrak. Order No. 238, In the Matter of Penn Central

Section 401(a) (1) further provides that any railroad discontinuing a train under this Act "must give notice in accordance with the notice procedures contained in section 13a(1) of the Interstate Commerce Act."

The Act provides that an Amtrak-railroad contract may be executed only during two time periods, namely (1) on or before May 1, 1971, and (2) between March 1, 1973 and January 1, 1975.

\* \* \*

On March 15, 1971 the Interstate Commerce Commission issued its Ex Parte Order 217 to provide (1) for the filing and posting of passenger train discontinuances, and (2) for filing with the Interstate Commerce Commission verified statements by the railroads that they had entered into valid contracts with Amtrak. By March 31, 1971 all of the railroads which planned to contract with Amtrak had filed and posted notices to discontinue passenger service on May 1, 1971.

On April 16, 1971 Amtrak tendered identical contracts to all the U. S. passenger railroads in the form annexed as Appendix A [omitted from published opinion]. These contracts contain the employee protective arrangements as required by Section 405 and such requirements were certified by the Secretary of Labor as "fair and equitable" on April 16, 1971. By April 27, 1971 nineteen railroads, listed in Appendix B attached hereto [omitted from published opinion], had signed contracts with Amtrak. The Court is informed that the trustees of the Penn Central System have also indicated their intention to contract with Amtrak.[2] Thus, with Penn Central Railroad's inclusion, the contracts with Amtrak and the railroads apply to approximately 95 percent of the intercity passenger service in the United States.

Transportation Co., Bankruptcy No. 70-347 (E.D.Penn.). By a separate order of April 28, 1971, the Congress of Railway Unions and the Railway Labor Executives' Association were denied leave to include the Penn Central as a defendant in the case at bar.

Against the foregoing background the Court now looks to the three cases pending before it.

## II.

### *Civil Action No. 825–71*

In this class action [3] (hereinafter the "Hodgson case") the Congress of Railway Unions and the Railway Labor Executives' Association have brought suit against James D. Hodgson, Secretary of Labor, Amtrak, Chesapeake and Ohio Railway, Baltimore and Ohio Railroad, and Seaboard Coast Line Railway, individually and as representatives of a class of an undetermined number of Class I railroads. They seek to have the Court review and hold invalid by way of declaratory and injunctive relief the Secretary's certification, pursuant to Section 405 of the Act, that "fair and equitable arrangements" have been made to protect employees affected by a discontinuance of intercity rail passenger service presently offered by the carriers.

The plaintiff's claim is founded upon the provisions of Section 405 of the Act, which reads:

"(a) A railroad shall provide fair and equitable arrangements to protect the interests of employees affected by discontinuances of intercity rail passenger service whether occurring before, on, or after January 1, 1975.

"(b) Such protective arrangements shall include, without being limited to, such provisions as may be necessary for (1) the preservation of rights, privileges, and benefits (including continuation of pension rights and benefits) to such employees under existing collective bargaining agreements or otherwise; (2) the continuation of

collective bargaining rights; (3) the protection of such individual employees against a worsening of their positions in respect to their employment; (4) assurances of priority of reemployment of employees terminated or laid off; and (5) paid training or retraining programs. *Such arrangements shall include provisions protecting individual employees against a worsening of their positions with respect to their employment which shall in no event provide benefits less than those established pursuant to Section 5(2) (f) of the Interstate Commerce Act.* Any contract entered into pursuant to the provisions of this title shall specify the terms and conditions of such protective arrangements. No contract under section 401(a) (1) of this Act between a railroad and the Corporation may be made unless the Secretary of Labor has certified to the Corporation that the labor protective provisions of such contract afford affected employees fair and equitable protection by the railroad.

"(c) After commencement of operations in the basic system, the substantive requirements of subsection (b) of this section shall apply to the Corporation. The certification by the Secretary of Labor that employees affected have been provided fair and equitable protection as required by this section shall be a condition to the completion of any transaction requiring such protection." [emphasis supplied]

The plaintiffs contend that the certification by the Secretary of Labor is invalid because the employee protective arrangements certified by him provide less benefits than those established pursuant to Section 5(2) (f) of the Interstate Commerce Act.[4]

---

3. The Court is of the opinion that this suit must be maintained as a class action. The number of railroads is too numerous to bring all before the Court; the right sought to be enforced by the plaintiffs against the class is a joint or common right; there is a common question of law or fact affecting the right of the

common relief sought. The relief granted by the Court will affect all railroads nationwide. Rule 23 F.R.Civ.P. 28 U.S. C.A.

4. The protective arrangements certified by the Secretary are set forth in Appendix C [omitted from published opinion].

In this regard the plaintiffs contend that Sections 4 and 5 of the Washington Agreement of May 1936 are incorporated under Section 405(b) of the Act by virtue of the Interstate Commerce Commission's administrative implementing of Section 5(2) (f) of the Interstate Commerce Act.

The defendants assert that the Court lacks jurisdiction; and, alternatively, that if the Court does assume jurisdiction its review is narrowly limited and that limited review of the Secretary's actions would demonstrate that the Secretary has complied with the mandate of the statute. Finally, the defendants assert that the plaintiffs have not established a right to injunctive relief.

### A. The Jurisdictional Question

Jurisdiction according to the plaintiffs is founded upon Section 307(a) of the Act which provides:

"If the Corporation or any railroad engages in or adheres to any action, practice, or policy inconsistent with the policies and purposes of this Act, obstructs or interferes with any activities authorized by this Act, refuses, fails, or neglects to discharge its duties and responsibilities under this Act, or threatens any such violation, obstruction, interference, refusal, failure, or neglect, the district court of the United States for any district court in which the Corporation or other person resides or may be found shall have jurisdiction, except as otherwise prohibited by law, upon petition of the Attorney General of the United States or, in a case involving a labor agreement, upon petition of any employee affected thereby, including duly authorized employee representatives, to grant such equitable relief as may be necessary or appropriate to prevent or

terminate any violation, conduct, or threat."

The plaintiffs assert that a Section 401 (a) (1) contract between a railroad and Amtrak is a "labor agreement" since it affects the jobs of thousands of workers and thus authorizes suit by "any employee affected thereby, including duly authorized employee representatives. * * * " The defendants claim, however, that the plaintiffs are neither employees nor their authorized representatives, but associations of the chief executive officers of various unions representing railroad employees, and that an Amtrak-railroad agreement cannot be considered a "labor agreement" if no union is a party to it.

More fundamentally, however, the defendants contend that the Court does not have jurisdiction under Section 307(a) to invalidate the Secretary's certification. They emphasize that Section 307 (a) provides for jurisdiction of suits only against (1) the Corporation or (2) a railroad, but that it does not authorize suits against the Secretary of Labor. If jurisdiction is present, they contend that it is narrowly limited to a review of whether the Secretary abused his discretion.

Kendler v. Wirtz, 388 F.2d 381 (3rd Cir. 1968) relied on by the defendants, appears to be on all fours with the case at bar. There, railroad employee associations sought to enjoin the Secretary of Labor from certifying that fair and equitable arrangements had been made to protect the interests of employees affected by federal grants-in-aid under the Urban Mass Transportation Act, 49 U.S.C. 1601 et seq. (1964). The Urban Mass Transportation Act contains a provision (49 U.S.C. 1609(c)) [5] virtually identical to Section 405 of the Rail Passenger Service Act. The Court held that it was without power to substitute

---

5. "Such arrangements shall include provisions protecting individual employees against a worsening of their position with respect to their employment which shall in no event provide benefits less than those established pursuant to section 5

(2) (f) of [the Interstate Commerce Act]. The contract for the granting of any such assistance shall specify the terms and conditions of the protective arrangements." 49 U.S.C. § 1609(c) (1964).

its judgment for the Secretary of Labor's judgment that employees had been afforded fair and equitable protection. We quote Chief Judge Hastie's opinion at length because of its pertinence.

"Assuming standing to sue, the scope of permissible review is limited. A mere difference of judgment between a person disadvantageously affected by agency action and the responsible head of the agency over the merits of particular administrative action as a means of achieving a legislative objective, when Congress has assigned authority to make and act upon such determinations to the agency, is not judicially reviewable. Panama Co. v. Grace Line Co. Inc., 356 U.S. 309, 78 S.Ct. 752, 2 L.Ed.2d 788 (1958) * * * United States v. Carmack, 329 U.S. 230, 67 S.Ct. 252, 91 L.Ed. 209 (1946) * * * Adams v. Nagle, 303 U.S. 532, 58 S.Ct. 687, 82 L.Ed. 999 (1938) * * * and Williamsport Wire Rope Co. v. United States, 277 U.S. 551, 48 S.Ct. 587, 72 L.Ed. 985 (1928). * * * Moreover, section 10 of the Administrative Procedure Act expressly excludes 'agency action * * by law committed to agency discretion' from judicial review. Nothing in the Urban Mass Transportation Act suggests that the exclusionary language of section 10 is inapplicable to the Secretary of Labor's required determination that protective arrangements adopted for the benefit of employees affected by a mass transportation project are 'fair and equitable' and constitute 'necessary' safeguards. To the contrary, the statutory standard is expressed in such general concepts that it requires and must contemplate the exercise of discretion in choice among various rational alternatives none of which can fully satisfy all demands of competing interests. Cf. Duesing v. Udall, 1965, 121 U.S.App.D.C. 370, 350 F.2d 748, * * *. Moreover, the absence of any provision in the Mass Transportation Act for judicial review of the Secretary's determination suggests that Congress recognized that the Secretary of Labor is at least as competent as a court to achieve such an accommodation of diverse and often conflicting social and economic interests as must be made in determining what employee protective arrangements incidental to mass transportation projects are 'equitable' and 'necessary.' We are concerned here with a type of determination that 'does not present questions of an essentially legal nature in the sense that legal education and lawyers' learning afford peculiar competence for their adjustment.' Frankfurter, J., concurring in Driscoll v. Edison Light & Power Co., 1939, 307 U.S. 104, 122, 59 S.Ct. 715, 724, 83 L.Ed. 1134.

\* \* \* \* \* \*

"It is for the reasonable accommodation of unavoidably conflicting interests in such a situation as this that the Congress has seen fit to make the judgment of the Secretary of Labor as to what is fair and equitable controlling. Cf. United States v. George S. Bush & Co., 1940, 310 U.S. 371, 60 S.Ct. 944, 84 L.Ed. 12, 59; \* \* \*. Swayne & Hoyt, Ltd. v. United States, 1937, 300 U.S. 297, 57 S.Ct. 478, 81 L.Ed. 659. Relating the attempted administrative compliance with the legislative directive to the limited judicial reviewing function outlined earlier in this opinion, we hold that it would not be appropriate for a court to substitute its judgment for the Secretary's judgment that railroad employees are afforded fair and equitable protection by the arrangements that have been made for their benefit."

388 F.2d at 383–384.

As in *Kendler,* it here appears clear that Congress did not intend to permit this vitally-needed program to be delayed or frustrated by Court challenges to the determinations of the Secretary of Labor under Section 405.

Then Secretary of Labor Schultz testifying in support of the Act stated:

"I assume that the coverage under the protective arrangements provision

(section 405 as enacted) is substantially of the same scope as the protective arrangements provision of the Urban Mass Transportation Act (section 13(c)). Any other interpretation would create difficulty in the administration of the protective arrangement in section 406." [6]

■ So far as this Court is aware there is no indication in the legislative history that Congress intended the Secretary's certification under Section 405 (b) of the Rail Passenger Service Act, unlike his similar determination under Section 13(c) of the Mass Urban Transportation Act, to be reviewable on the merits by the courts.[7]

Situations analogous to the case at bar have arisen around actions of the National Mediation Board. Courts have held that the Board's action in resolving representation disputes and in certifying authorized employee representatives are final and not reviewable.

In Switchmen's Union v. National Mediation Board, 320 U.S. 297, 64 S.Ct. 95, 88 L.Ed.2d 61 (1943) the Supreme Court held that courts do not have jurisdiction to review a certification by the National Mediation Board, pursuant to Section 2 Ninth of the Railway Labor Act (45 U.S.C. § 152 Ninth) (1964), designating "the individuals or organizations that have been designated and authorized to represent the employees" involved in a representation dispute. The Court pointed out, among other things, that:

"The Act in § 2, Fourth writes into law the 'right' of the 'majority of any craft or class of employees' to 'determine who shall be the representative of

the craft or class for the purposes of this Act.' That 'right' is protected by § 2, Ninth which gives the Mediation Board the power to resolve controversies concerning it and as an incident thereto to determine what is the appropriate craft or class in which the election should be held. * * * A review by the federal district courts of the Board's determination is not necessary to preserve or protect that 'right'. Congress for reasons of its own decided upon the method for the protection of the 'right' which it created. It selected the precise machinery and fashioned the tool which it deemed suited to that end. Whether the imposition of judicial review on top of the Mediation Board's administrative determination would strengthen that protection is a considerable question. All constitutional questions aside, it is for Congress to determine how the rights which it creates shall be enforced. * * * In such a case the specification of one remedy normally excludes another. * * *" 320 U.S., at 300–301, 64 S.Ct. at 97.

So, in the instant case, the defendants assert, Congress has selected the Secretary of Labor—not the courts—to protect the right of employees "to fair and equitable" protective arrangements. And, as the Supreme Court further pointed out in *Switchmen's Union*:

"The fact that the certificate of the Mediation Board is conclusive is of course no ground for judicial review. * * * Congress has long delegated to executive officers or executive agencies the determination of complicated questions of fact and of law. And where no judicial review was provided

6. Supplemental Hearings on H.R. 17849 and S. 3706 before the Subcomm. on Transportation and Aeronautics of the House Committee on Interstate and Foreign Commerce, 91st Cong., 2nd Sess., at 65 (1970).

7. In addition to relying upon Section 307 (a) of the Rail Passenger Service Act, the plaintiffs also rely upon Section 10 of the Administrative Procedure Act (5 U.S.C. § 702) as a basis for the jurisdiction of this Court to review the cer-

tification by the Secretary of Labor. However, Section 10 of the Administrative Procedure Act expressly does not apply "to the extent that—(1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law." 5 U.S.C. § 701(a). Further Kendler v. Wirtz, *supra*, held that the Administrative Procedure Act did not afford a basis for judicial review of the Secretary of Labor's determination under the Urban Mass Transit Act.

by Congress this Court has often refused to furnish one even where questions of law might be involved. * * We need not determine the full reach of that rule. * * * But its application here is most appropriate by reason of the pattern of this Act.

"While the Mediation Board is given specified powers in the conduct of elections, there is no requirement as to hearings. And there is no express grant of subpoena power. The Mediation Board makes no 'order.' And its only ultimate finding of fact is the certificate. * * * The function of the Board under § 2, Ninth is more the function of a referee. To this decision of the referee Congress has added a command enforceable by judicial decree. But the 'command' is that 'of the statute, not of the Board.' * *" 320 U.S., at 303–304, 64 S.Ct. at 98. Here, the defendants contend, too, the Secretary of Labor makes only a "certification," not an "order," and that certification constitutes his "only ultimate finding of fact. * * *" The Secretary also is not required by the Act to hold hearings, and is not granted subpoena power. His function is clearly "more the function of a referee," and any "command" to effectuate the protective arrangements he certified is that of the statute, not of the Secretary.

The Court of Appeals recently discussed the rationale for giving finality to National Mediation Board determinations under the Railway Labor Act—a rationale fully applicable to the role of the Secretary of Labor here. International Association of Machinists v. National Mediation Board, 138 U.S.App.D.C. 96, 425 F.2d 527 (1970).

The Court noted that in *Switchmen's Union* the Supreme Court "found that the intent was plain to make that agency certification finding 'the last terminal point.' 'There was to be no dragging out of the controversy into other tribunals of law.'" 425 F.2d at 535. The Court further pointed out that the legislative intent of finality for the Board's certification was discerned in *Switchmen's Union* from three conjoining elements: "the

source of the pertinent rights in an act of Congress; confidence that they could be fully and reasonably vindicated by the agency, without need for a court's involvement, and the need for expedition in determination." 425 F.2d at 536. Clearly, these elements are equally present and appropriate in the case at bar.

We conclude, therefore, that the Congress in the Rail Passenger Service Act has committed the determination of what arrangements would provide "affected employees fair and equitable protection" to the discretion of the Secretary of Labor, that the Congress has not made the Secretary's certification in that regard subject to judicial review, and, consequently, that the unions' complaint in this case should be dismissed for lack of jurisdiction.

However, assuming that the Court does have jurisdiction to review the action of the Secretary, that review must be narrowly and carefully limited. Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); Duesing v. Udall, 121 U.S.App.D.C. 370, 350 F.2d 748 (1965); Calcutta East Coast of India & East Pakistan v. Federal Maritime Commission, 130 U.S.App.D.C. 261, 399 F. 2d 994 (1967).

### B. *Limited Review*

This limited review looks only to the question of whether the Secretary abused his discretion in certifying the protective arrangements as "fair and equitable." Plaintiffs contend that Section 405(b) of the Act incorporates verbatim Sections 4 and 5 of the "Washington Agreement." That Agreement sets out the essential requirements of notice, negotiation and arbitration and implementing agreement, and is contained in the "New Orleans Conditions," which the Interstate Commerce Commission has applied in various merger and consolidation cases. Anything less than the precise language of Sections 4 and 5, the plaintiffs claim, would provide less benefits than Section 5(2) (f) of the Interstate Commerce Act and be therefore a violation of Section 405(b).

The defendants argue, and are backed by a Department of Justice opinion,[8] that the precise language of Sections 4 and 5 need not be included but only some form of notice and some right of negotiation and arbitration of the type contained in Sections 4 and 5 is required in any protective arrangement. This view of Section 405 is strengthened when the time element written into the statute by Congress is considered. There is a period of only six months between the passage of the legislation and the date on which the system is to become effective. Congress could not have intended the system to begin on May 1 and also expected the prolonged period of notice and negotiation required by Sections 4 and 5 of the Washington Agreement to be followed. Such is impossible. Thus Congress left to the Secretary of Labor the task of seeing that employees affected by reason of discontinuances would receive fair and equitable treatment.

The protective arrangements certified by the Secretary not only meet the requirements of Section 405 of the Act and of Section 5(2) (f) of the Interstate Commerce Act but they in fact exceed these requirements in significant respects.[9]

Perhaps most significantly, the protective arrangements exceed the requirements of Section 5(2) (f) by extending the protective period from four years to six years. Further, the burden of proof provisions have been couched in terms which make it likely that far more employees will receive the protections provided by the arrangements than has been the case with respect to previous protective conditions under Section 5(2) (f) of the Interstate Commerce Act.

Section 4 of the certified arrangements requires notice, negotiation, and arbitration of matters left unresolved by negotiations, as in the so-called "Washington Agreement," pursuant to Section 5 (2) (f) of the Interstate Commerce Act.

In applying Sections 4 and 5 of the Washington Agreement, the certified arrangements provide procedures which also make possible compliance with the statutory mandate that the Corporation begin the provision of intercity rail passenger service on May 1, 1971. As required by the statutory mandate, Section 4 of the certified arrangements allows train discontinuances by railroads and reassignment of affected employees pending the outcome of arbitration. At the same time, Section 4 fully protects such employees during the arbitration period and further provides that any employee improperly displaced, dismissed, or reassigned will be made whole. Thus, no employee can be adversely affected by the procedure contained in the certified arrangements, and at the same time, those arrangements satisfy the Act's requirements for the discontinuance of intercity rail passenger service on May 1, 1971.

Further, Article V of the certified arrangements specifically provides that these arrangements are intended to confer benefits no less than those established pursuant to Section 5(2) (f) of the Interstate Commerce Act, and that all conflicts are to be resolved in favor of providing employee protection and benefits no less than those established pursuant to Section 5(2) (f).

Thus we hold that the Secretary has not abused his discretion in certifying the employee's protective arrangements.

### C. *Appropriateness of Injunctive Relief*

■ The standards which govern the issuance of a preliminary injunction are set forth in Virginia Petroleum Jobbers Association v. Federal Power Commission, 104 U.S.App.D.C. 106, 259 F.2d 921 (1958). Essentially they are:

(1) Has the petitioner made a strong showing that it is likely to prevail on the merits of its appeal;

8. See letter from William H. Rehnquist, Assistant Attorney General to Laurence Silberman, Under Secretary, Department of Labor dated April 7, 1971, attached as Appendix D [omitted from published opinion].

9. See Secretary of Labor's affidavit attached hereto as Appendix E [omitted from published opinion]. See also the Comparison of Benefits attached hereto as Appendix F [omitted from published opinion].

(2) Has the petitioner shown that without such relief it will be irreparably injured;

(3) Would the issuance of a stay substantially harm other parties interested in the proceedings;

(4) Where lies the public interest.

Considering those standards seriatum:

■ (1) In view of the foregoing the Court is of the opinion that the plaintiffs have *not* made a strong showing that they are likely to prevail on the merits. Not only is it highly questionable whether the courts do have jurisdiction to review the certification by the Secretary of Labor, but even if such jurisdiction does exist, the certification should be affirmed on the merits.

(2) Plaintiffs' claim of irreparable injury cannot be sustained. As is made clear by the Secretary's affidavit and the protective provisions themselves, employees have been provided protection which meets—in fact, exceeds—the requirements of Section 405 of the Act and are not less than the benefits established pursuant to Section 5(2) (f) of the Interstate Commerce Act. Thus, no injury can be sustained by the employees if this Court declines to interfere with the direction of Congress that the Corporation begin providing intercity rail passenger service on May 1, 1971.

(3) and (4) As shown above, the legislative history of the Act and the findings in the Act itself make clear that Congress regarded as imperative the timely implementation of the Act. Congress directed that the Corporation begin providing intercity rail passenger service on May 1, 1971. Moreover, Section 401(a) (1) authorizes the Corporation to contract with railroads on or before May 1, 1971 and, again, on or after March 1, 1973, for the purpose of relieving the railroads of responsibility for the provision of intercity rail passenger service. Thus, if this Court were to declare invalid the contracts which have been entered into between the Corporation and the railroads, the statutory plan would be seriously jeopardized. The

frustration of the intent of Congress and the threat of grave injury to the public and to the railroads should be obvious. These factors, in themselves, require that plaintiffs' motion be denied.

Accordingly, plaintiffs' motion for preliminary injunction is denied.

III.

*Civil Action No. 843-71*

In this class action [10] two associations of railway labor unions, a railroad passengers' association, and two state agencies seek to enjoin the Burlington Northern and other railroads from discontinuing certain intercity passenger trains that are not included within the basic system of intercity rail passenger service designated by the Secretary of Transportation. Plaintiffs base their demand for preliminary injunction on the fact that the railroads gave public notice of the proposed discontinuances before they had entered into contracts with Amtrak, and in so doing violated Section 401(a) (1) of the Act.

Section 401(a) (1) provides in part:

"Upon its entering into a valid contract (including protective arrangements for employees) the railroad shall be relieved of its responsibility as a common carrier of passengers by rail in intercity rail passenger service under Part I of the Interstate Commerce Act * * *. Provided, that any railroad discontinuing a train hereunder must give notice in accordance with the notice procedures contained in section 13a(1) of the Interstate Commerce Act."

Section 13(a) (1) of the Interstate Commerce Act prescribes the procedures by which notice of a proposed discontinuance of passenger trains is given to the public, and provides that such notice of discontinuance is not effective unless it is posted for at least thirty days prior to the date for discontinuance.

The language of Section 401(a) (1) and its legislative history clearly shows Congress' intent to utilize the thirty day notice procedures of Section 13(a)

10. Note 3, *supra.*

(1). The House Committee on Interstate and Foreign Commerce reported that after the contract had been entered into

> "the corporation would operate (most likely by entering into a service contract with such railroad) passenger trains between basic system points presently served by such railroad. The railroad would be allowed to discontinue other passenger trains *by simply giving the 30-day notice required by section 13a(1) of the Interstate Commerce Act.* Other requirements of section 13a would no longer be applicable." [emphasis supplied] [11]

The railroads filed their notices of discontinuances on March 31, 1971 and Amtrak tendered contracts to the railroads on April 16, 1971. If their contracts with Amtrak are valid, the railroads will be relieved of all responsibilities for intercity passenger service on May 1, 1971, and, as the Court determined in the Hodgson case, *supra,* it feels that such contracts are in fact valid.

But, even assuming validity, the plaintiffs claim that the notice cannot become effective until thirty days *after* valid contracts have been entered into since only "upon its entering into a valid contract" does a railroad obtain discontinuance rights.

■■ If the contentions of the plaintiffs are sound, then the Congressional intent to put Amtrak into operation on May 1, 1971 as required by Section 401 (b) is obviously thwarted for, since the contracts signed by the various railroads were executed only after April 16, 1971, the thirty day period cannot run until May 16, 1971 or later. A construction of the statute which thwarts the declared intention and policy of Congress is to be avoided, and in the opinion of this Court it can be avoided by a correlation of the first and last sentences of Section 401(a) (1) of the Act. The first sentence states that "on or before May 1, 1971 the Corporation is authorized to contract * * *." This is a clear declaration that Congress was leaving the door open to the contracting parties until midnight of April 30, 1971. So intending, Congress just as clearly would not have included language in the notice proviso (the last sentence of 401 (a) (1)) which would delay operations beyond the May 1 operating deadline. This Court accordingly holds that the thirty day notice provision is not related to the date of contracting.

■ The Court finds merit, too, in the contention of the defendants that Section 307(a) precludes judicial enforcement of the notice requirement of Section 401(a) (1) except upon petition of the Attorney General.

Section 307(a) reads:

> "(a) If the Corporation or any railroad engages in or adheres to any action, practice, or policy inconsistent with the policies and purposes of this Act, obstructs or interferes with any activities authorized by this Act, refuses, fails, or neglects to discharge its duties and responsibilities under this Act, or threatens any such violation, obstruction, interference, refusal, failure, or neglect, the district court of the United States for any district in which the Corporation or other person resides or may be found shall have jurisdiction, except as otherwise prohibited by law, upon petition of the Attorney General of the United States or, in a case involving a labor agreement, upon petition of any employee affected thereby, including duly authorized employee representatives, to grant such equitable relief as may be necessary or appropriate to prevent or terminate any violation, conduct, or threat."

■ As this section clearly states, the jurisdiction of the courts to apply sanctions for violations of the Act attaches only upon the petition of the Attorney General of the United States. The sole exception is suits by employees and their representatives in cases involving labor agreements. Since the plaintiffs are not parties to the contracts between the railroads and Amtrak, and more

---

11. H.R.Rep.No.91–1580, 91st Cong., 2nd Sess. 9 (1970).

importantly since the unions are not directly concerned with the notice procedures, a labor agreement is not involved and no rights peculiarly pertaining to employees are asserted. Accordingly, the only person with standing to seek the relief demanded in this action under Section 307 is the Attorney General. He has chosen not to act.

This conclusion is bolstered by the legislative history of Section 307. It discloses a Congressional intent to provide an exclusive remedy for violations of the Act and not to grant standing to *any* aggrieved person to seek sanctions. Two of the plaintiffs in this action, Congress of Railway Unions, and Railway Labor Executives' Association, urged during the Congressional consideration of this Act the adoption of an amendment which would have permitted *any* person aggrieved to bring suit against Amtrak or the railroads for violations of the Act. Testimony pointed out that:

> "As the bill now reads, only the Attorney General, except in cases involving a labor agreement, could bring such actions. Moreover, the present language of section 307 makes only the Corporation subject to suit for violations of the act and our amendment would include any railroad which might not discharge all of its obligations under the law." [12]

The Committee adopted the proposal to make the railroads subject to suit but explicitly rejected the request that standing to seek judicial enforcement of the Act be broadened to include *any* person aggrieved.

Thus, despite the fact that some members of Congress feel that the signing of a valid contract is a prerequisite to the utilization of the thirty day notice period,[13] the Court is constrained to look to the language of the Act as it passed. Clearly in a non-labor agreement dispute only the Attorney General can bring suit for violation of the Act. The plaintiffs do not have standing and this suit must be dismissed.

## IV.

### *Civil Action No. 842–71*

In this case the plaintiff passenger organization seeks a preliminary injunction against the Chesapeake and Ohio Railroad and the Baltimore and Ohio Railroad from discontinuing certain passenger trains that have not been included in the basic transportation system of Amtrak. As grounds for injunctive relief plaintiff claims (1) that the railroad notices of discontinuances were filed before valid contracts were entered into between Amtrak, the railroad thereby violating Section 401 of the Act; (2) that six of the trains to be discontinued are not intercity passenger trains but are commuter trains which are excluded from the Act.

The defendants contend that the plaintiff organization is not a proper party to bring suit under Section 307 for violation of the Act, and that in any event the Act does not require the railroad to have entered into a valid contract with Amtrak prior to posting notices of discontinuance. They further contend that the trains to be discontinued are intercity passenger lines and not commuter lines as defined in Penn Central Transportation Co. Discontinuance or Change of Service, 338 I.C.C. 318, 326 (1971). Finally they contend that no material allegations of the complaint relate to the

---

12. Supplemental Hearings on H.R. 17849 and S. 3706 before the Subcomm. on Transportation and Aeronautics of the House Comm. on Interstate and Foreign Commerce, 91st Cong., 2nd Sess. 134 (1970).

13. See the comments of Chairman Staggers at the Hearing before the Subcommittee on Transportation and Aeronautics of the House Committee on Interstate Commerce whose purpose was a review of provisions of P.L. 91–518.
> "These contracts were not entered into 30 days prior to May 1, 1971. Therefore, the 30 day notice period should not commence to run out any earlier than the date of each contract." Tr. at 7.

However, note that this was only the personal view of Chairman Staggers. "I only speak for myself, I don't speak for any other member." Tr. at 68–69.

Chesapeake and Ohio Railway Company and that the complaint should be dismissed as to it.

The Court held in the Burlington case, *supra,* that the signing of a valid contract is not a prerequisite to the railroad's filing of the thirty day discontinuance notice and that in a non-labor agreement situation such as the case at bar only the Attorney General under Section 307 can bring suit for violations of the Act. Plaintiff's case does not involve a labor agreement and, accordingly, plaintiff has no standing to sue. The suit is dismissed.

V.

The foregoing constitutes the Court's findings of fact and conclusions of law in each of the cases discussed, and it is hereby

Ordered that plaintiffs' motion for preliminary injunction in Civil Action No. 825–71 is denied, Civil Action No. 842–71 is dismissed, and Civil Action No. 843–71 is dismissed.